NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3458-13T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JAMES GLEATON, a/k/a WALTER E. GLEATON,
WALTER MASON,

    Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**August 9, 2016**

**APPELLATE DIVISION**

Submitted December 2, 2015 — Decided August 9, 2016

Before Judges Fuentes, Koblitz and Gilson.

On appeal from Superior Court of New Jersey, Law Division, Mercer County, Indictment No. 10-12-1314.

Joseph E. Krakora, Public Defender, attorney for appellant (Kevin G. Byrnes, Designated Counsel, of counsel and on the brief).

Angelo J. Onofri, Acting Mercer County Prosecutor, attorney for respondent (Amanda E. Nini, Special Deputy Attorney General/ Acting Assistant Prosecutor, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Defendant James Gleaton was tried before a jury and convicted of first degree possession of cocaine with intent to

distribute, N.J.S.A. 2C:35-5a(1); first degree distribution of cocaine, N.J.S.A. 2C:35-5a(1); third degree possession of cocaine, N.J.S.A. 2C:35-10a(1); and fourth degree maintaining a narcotics nuisance, N.J.S.A. 24:21-21a(6). At sentencing, the trial judge merged the first degree distribution of cocaine conviction with the convictions for first degree possession of cocaine with intent to distribute and third degree possession of cocaine and sentenced defendant to a term of sixteen years with a mandatory eight-year period of parole ineligibility. On the remaining fourth degree conviction for maintaining a narcotics nuisance, the judge sentenced defendant to a term of fourteen months to run concurrent with the sixteen-year term.

This was the second time defendant stood trial on these charges. The first trial held in March 2013 ended in a mistrial when the jury was unable to reach a unanimous verdict on any of the charges. The second trial began on Thursday, October 24, 2013. The State rested its case on the afternoon of the following day, Friday, October 25, 2013. Defendant was the only witness called for the defense when the trial resumed on Monday, October 28, 2013. The jury began deliberating on Tuesday morning, October 29, 2013. After three days of deliberations mired by accusations of incivility against the foreperson by a group of nine jurors, the trial judge decided to strip juror

number 1 of her position as foreperson and of the commensurate responsibilities attendant thereto. Soon thereafter the jury returned a verdict finding defendant guilty on all of the charges.

In this appeal, defendant argues the following events prejudiced his right to a fair trial and warrants the reversal of his conviction: (1) the jury's deliberations were tainted by the disorder caused by a conflict between the foreperson and a group of nine jurors led by juror number 10; (2) a juror's personal account of an alleged incident of retaliation by drug dealers unrelated to this case undermined the jury's ability to impartially review the evidence presented at trial; (3) a statement made by a law enforcement witness implied defendant was the head of a narcotics "network"; (4) the trial judge's evidential rulings violated defendant's right to present a complete defense; (5) the cumulative effect of these errors warrant the reversal of defendant's conviction; and (6) the sentence imposed by the court was excessive.

After reviewing the record developed at trial, we are compelled to vacate the jury's verdict and remand the matter for a new trial. The trial judge's well-intended efforts to ameliorate the acrimonious environment created by a conflict between the foreperson and nine other deliberating jurors unduly

A-3458-13T1

interfered with the jury's autonomous role as the judges of the facts. The record shows the trial judge was driven by an overriding concern for creating a deliberative environment capable of allowing the jury to return a unanimous verdict. As a consequence, the judge viewed a juror's position against further deliberations not as a legitimate stance, but as an unreasonable impediment to the goal of reaching a unanimous verdict. Because of "the weighty role that the judge plays in the dynamics of the courtroom," State v. Figueroa, 190 N.J. 219, 237-38 (2007), a trial judge must guard against showing any bias against dissent and in favor of unanimity. A jury's verdict cannot be the product of coercion to any degree. Ibid.

Here, the trial judge's response to a note he received from the foreperson on the second day of deliberations, announcing the jury had reached "an impasse" based on an eleven to one split in favor of continuing to deliberate, constituted reversible error because it was not carefully calibrated to avoid creating the impression that the court had taken sides in favor of unanimity and against the one holdout juror. The trial judge compounded this error in the manner he responded to a group of nine jurors' complaints about the foreperson's leadership style.

The judge's decision to allow these nine jurors to elect a "spokesperson" to convey their collective grievances exacerbated the factionalism developing within the jury and improperly elevated the status of the spokesperson within the jury. Even more troubling was the judge's decision to allow the "spokesperson" to discuss these matters with the judge and counsel privately at sidebar, thereby excluding the eight jurors he was elected to represent. This approach was needlessly vulnerable to the personal bias of the "spokesperson" and ultimately provided the court with an incomplete and potentially skewed account of the foreperson's alleged shortcomings.

More importantly still, the judge accepted the veracity and accuracy of the spokesperson's account to characterize the foreperson as an "obstructionist" and consequently unsuitable to continue to serve in this capacity. As we will explain in greater detail, the judge's reliance on our decision in State v. Rodriguez, 254 N.J. Super. 339 (App. Div. 1992), as authority to support taking the extraordinary step of replacing juror number 1 as foreperson, was misplaced. Although we are satisfied the judge's decision was well-intended, it nevertheless had the capacity of being perceived by the foreperson as a retaliatory act intended to coerce her to change her stance in the deliberations to produce a unanimous verdict. The judge's bias

in favor of unanimity was impermissibly coercive. Figueroa, supra, 190 N.J. at 236.

I

The State's case against defendant was primarily based on the testimony of two witnesses, Trenton Police Detective Ronald Pope and defendant's friend, turned confidential informant, N.A. Pope arranged to make a controlled purchase of cocaine from defendant. N.A. agreed to become a confidential informant after he was arrested by the Trenton Police Vice Enforcement Unit and charged with unlawful possession of weapons and narcotics.

Detective Pope was the first witness called by the State. He began his career as a sheriff's officer in the Mercer County Sheriff's Office in 1996, before transferring to the Trenton Police Department two-and-a-half years later. At the time of defendant's arrest Pope was employed as a Detective by the Trenton Police Department, working as a full-time task force officer with the United States Drug Enforcement Administration (DEA). He described to the jury the role N.A. played as a confidential informant in the investigation that led to defendant's arrest. Pope testified that "no promises" are made to informants in exchange for their cooperation. The prosecutor is the only one who has the authority to enter into an agreement with an informant related to the charges they are facing and the

terms of any sentence recommendation to the court. In this case, the charges N.A. was facing in State Superior Court were dismissed and federal narcotics and weapons possession charges were filed against him in the United States District Court for New Jersey.

Pope testified that based on his discussions with N.A., the DEA Task Force decided to initiate a long term investigation to focus on not only defendant, "but we also wanted to focus on his associates as well as his whole network." This prompted an immediate objection from defense counsel. When the trial judge asked defense counsel whether he wanted to discuss the matter at sidebar, counsel responded: "I don't think so, Judge." Thereafter the trial judge sustained the objection and instructed the jury to disregard this part of Pope's testimony as "irrelevant." The judge also struck from the record Pope's comments concerning defendant's "associates" and "network."

Based on information provided by N.A., Pope and his fellow task force members began their "long term investigation" of defendant's alleged distribution of illicit narcotics by telephoning defendant to arrange a place to meet to discuss the purchase of a quantity of cocaine. On September 24, 2009, at approximately 11:00 a.m., Pope met with N.A. in the parking lot of Freddie's Tavern in Ewing Township. Pope directed N.A. to

call defendant on the phone using a digital recorder to record the conversation. The first time N.A. called, defendant did not answer and the call was redirected to voicemail.

According to Pope, N.A. told him this was normal behavior and immediately called defendant a second time. That time, defendant answered. Pope testified the conversation between N.A. and defendant was recorded. The jury was given a copy of the transcript of the conversation. During this initial conversation, N.A. and defendant agreed to meet between 5:00 p.m. and 6:00 p.m. that same day.

The State's case centered on the "controlled buy" that took place on September 24, 2009. As Pope explained, law enforcement officers used $5700 of government funds to buy the illicit narcotics. Pope testified that in the course of the recorded conversation between N.A. and defendant, "it was determined through [N.A.] that the going price would be approximately $37 per gram and we wanted to buy 150 grams." Law enforcement agents monitored the exchange of the funds with defendant utilizing a digital audio recorder and an audio transmitter. They wanted "to establish stationary surveillance on the target residence" while other officers were in their cars and able to respond if necessary.

Before the jury heard the audio recording, the trial judge gave a cautionary instruction concerning the quality of the recording, the possible distortions or interference caused by ambient noise, as well as an individual person's manner of speaking. The judge emphasized to the jury that they were to use the transcripts only as a guide because "[t]he audio recordings themselves [were] the primary evidence." Each juror should therefore resolve any discrepancy between the transcription of the conversation and the audio recording in favor of the actual recording.[1]

Pope and DEA Special Agent Eric Brown met with N.A. at approximately 5:15 p.m. at Freddie's Tavern in Ewing Township. N.A. placed another call to defendant to solidify their plan. The two men agreed to meet at defendant's residence. Trenton Police Officer David Ordille established a stationary location from which to monitor defendant's residence. Prior to sending N.A. to meet with defendant, the officers searched N.A. to confirm he did not have any money, weapons, or contraband on his person or motorcycle. They outfitted N.A. with both an audio digital recorder and an audio transmitter. According to Pope,

---

[1] The two compact discs that contained the recording of these interactions were moved into evidence by the State without objection by defense counsel.

the audio digital recorder is "very small" and was intended to be concealed on N.A.'s person. Unfortunately, the officers subsequently discovered that the recorder "did not work." However, the transmitter was able to transmit the live interactions between N.A. and defendant. Pope was unable to explain why the digital recorder failed to work.

Officer Ordille was stationed in the woods approximately 100 feet from defendant's residence and twenty feet from the property line. The police officers did not lose sight of N.A. during the time he drove his motorcycle from the place where he originally met Pope and Brown to when he arrived at defendant's residence. Ordille saw defendant walk up to the residence and sit on the front porch. He also saw N.A. arrive on his motorcycle, park, and get off the bike. Although Ordille saw defendant walk over to N.A. and engage in conversation with him for a few minutes, he could not hear what was said. Following the conversation, the two men entered the front door of the residence. From his vantage point, Ordille could not see defendant or N.A. while they were in the residence.

After approximately ten minutes, N.A. came out of the residence through the front door, got back on his motorcycle, and drove away. Ordille notified Pope and Brown that N.A. had left defendant's residence. This was intended to signal them to

continue to surveil N.A. from this point forward. Pope and Brown followed N.A. back to the prearranged location at Freddie's Tavern, without losing sight of him at any point along the way.

Upon arriving at the Tavern, the law enforcement agents retrieved the transmitters from N.A.'s person, collected the cocaine he had purchased from defendant, and searched him and the motorcycle once again for any additional contraband or money. The cocaine N.A. purchased from defendant was in a closed, clear plastic bag. It was subsequently tested and identified as 149.8 grams, or 5.284 ounces, of cocaine. Defendant stipulated the substance tested was cocaine in a written statement the judge read to the jury.

On October 6, 2010, over a year after N.A. made the controlled buy from defendant, the police executed a search warrant to search defendant's residence. After conducting an exhaustive search, the officers were unable to find any contraband on the premises. The police nevertheless arrested defendant that day based on the evidence recovered from the controlled buy. At a pretrial hearing, the trial judge barred defense counsel from informing the jury of the outcome of the search of defendant's residence on October 6, 2010.

The State called Brown and Ordille to corroborate and expand upon Pope's testimony. The State called N.A. as its final witness. N.A. expounded upon his role in bringing defendant to the State's attention in consideration for a more lenient sentence on his pending charges. As noted earlier, N.A. was originally arrested on July 9, 2009, by the Trenton Police Department. In an effort to help himself, he agreed to become a confidential informant and assist state law enforcement officers in conducting an investigation into defendant's alleged narcotic activities.

On October 25, 2013, the day N.A. was scheduled to testify at trial, the judge placed the following on the record:

> [A]s you know there were two applications made to the [c]ourt late yesterday after the jury was sent home. After four p.m. yesterday [defense counsel] on behalf of his client requested police reports in regard to the confidential informant [N.A.], who was arrested on July 9, 2009. We know this confidential informant is going to be called as [a] witness by the State this morning and obviously his credibility is a critical issue in this case. . . .
>
> For the first time defendant made a request of this [c]ourt for the police reports underlying that arrest on July 9, 2009. I asked that [the prosecutor] provide that material to the [c]ourt. He very promptly emailed it to me after 4:30 last night. Discovery consists of 65 pages, so I took it home last night to review in detail and I've made a decision that defendant is entitled

> to this discovery.  I believe it will assist him in attacking the credibility of [N.A.].

The court gave defense counsel a complete, un-redacted copy of the report, after confirming the prosecutor did not have any objections.  Before physically turning the report over to defense counsel, the judge noted there were certain allegations in the police report that "did not result in any charges in [the] federal indictment."  In response, the prosecutor acknowledged that "an undercover officer says that [N.A.] approached his car with a gun . . . directly pointing the gun at him. . . .  [P]laying devil's advocate saying that [defense counsel] is allowed to inquire into that, how is that relevant to anything going on in this trial?"  The judge responded it was relevant to show "[N.A.] is testifying out of consideration."

Defense counsel argued that the facts as described in the police report showed N.A. could have been charged under New Jersey law with committing an aggravated assault against the officer by pointing a firearm at him.  Defense counsel maintained the failure of the federal indictment to include this charge was relevant to show it was part of the favorable consideration N.A. received for his cooperation.  N.A. testified at the N.J.R.E. 104 hearing that he was aware that the Trenton Police Department had charged him with "pointing a firearm at an Officer Flowers."  However, he did not discuss that particular

charge with any state or federal law enforcement agent; no promises were ever made regarding that charge; and he did not know why the charge was not included in the federal indictment. N.A. speculated the federal authorities did not include the charge in the indictment because the offense was committed against a Trenton Police Officer, not a federal agent.

Although the trial judge was initially inclined to allow defense counsel to question N.A. about the failure to prosecute this charge, he ultimately found N.A.'s speculation persuasive. The judge gave the following explanation for his ruling:

> [T]he Court has looked at and listened very carefully to [determine] whether [N.A.] got consideration for the dismissal of that aggravated assault as a result of cooperating.
>
> He certainly has no knowledge. In fact, he knew something that perhaps the Court didn't know, is that perhaps the reason it wasn't carried over is that had he pulled a gun on a federal agent, a federal employee, as he noted, perhaps it would have been carried over, but it was just a lowly, so to speak, Trenton Police Officer, so in that sense the Court's going to rule that that cannot be gone into on cross examination by the defendant.
>
> . . . .
>
> The Court is also mindful of <u>Rule</u> 403, that arguably [defense counsel] argues it's relevant evidence, but I think getting into that charge can be a little confusing to a jury. It's not in the indictment and can be a waste of time, and certainly the jury is

going to hear all the prior criminal charges for which this defendant's been indicted, the fourth charges I just reiterated on the record, plus consideration that he's presumably receiving, to testify in this trial and with the pending indictment hanging over his head.

The State rested its case in chief at the conclusion of N.A.'s testimony. Defendant was the only witness for the defense. He denied ever discussing the sale of illicit narcotics with N.A. during the recorded telephone conversations. He testified that any references to selling or buying referred to motorcycles because he and N.A. are both motorcycle enthusiasts. He knew of N.A.'s reputation as a drug dealer and about N.A.'s home being raided by the police from conversations he had with his cousin.

<u>A</u>

<u>FIRST DAY OF DELIBERATIONS</u>

The jury reported to the trial court on the morning of October 29, 2013 to begin deliberations. After reviewing the verdict sheet and selecting the alternate, the trial judge addressed juror number 1 as follows:

THE COURT: Juror Number 1, you . . . will be the foreperson of the jury because of your position in the jury box. If you decide to take on this task, you will preside over deliberations and tell us the verdict when reached. Your vote carries no greater weight than that of any other deliberating juror. It will be your

responsibility to lead deliberations.  It is also your responsibility to tell us what the verdict is when the jury has reached it.

Juror Number 1, are you willing to take on those responsibilities?

JUROR NUMBER 1: Yes, sir.

The jury began deliberating at 9:35 a.m.  The matter proceeded from this point without incident until the trial judge informed the attorneys he had received a note from the jury at 11:21 a.m., stating: "Your Honor, we are unable to reach a unanimous verdict on Count 1."  The note was signed by Juror Number 1 in her capacity as foreperson.  The judge reminded the attorneys the jury had begun deliberating at 9:35 a.m., and had taken a twenty-minute break when a beverage order was delivered.  Based on this, the judge calculated the jury had only actually deliberated for approximately one hour and thirty minutes.  He thus intended to instruct the jury to continue deliberating by reading "the model jury charge which is entitled, judges instructions on further jury deliberations."  Both attorneys agreed.

The judge brought the jury into the courtroom and told them he estimated they had been deliberating "approximately an hour-and-a-half."  He also reminded the jury that during the initial voir dire "you all indicated you were available through this week.  So I'm going to send you back into the jury room for

continued deliberations."  The judge then read to the jury the model charge our Supreme Court approved in State v. Czachor, 82 N.J. 392, 405 n.4 (1980):

> It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors.
>
> In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous.  But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.  You are not partisans, you are judges.  Judges of the facts.

The judge directed the jury to continue deliberating until 12:30 p.m., when they would recess for lunch.

The next communication from the jury came sometime after the lunch recess in the form of two notes.  As read by the judge, the first note stated: "Your Honor, Juror Number 9 requests to see Your Honor as a question she quote does not want the rest of the jury to hear.  It is not regarding the case.  Close quote.  Signed by the foreperson."  The second note stated: "'Your Honor, the jury requests to hear the full

17

testimony of W' - - which I take to mean witness - - '[N.A.] or a transcript of same.'  Again signed by the foreperson."

With approval of both attorneys, the judge decided to bring juror number 9 into the courtroom "to find out what's on her mind and make a decision after I speak to her and hear from counsel."  Juror number 9 came into the courtroom and sat in the empty jury box.[2]  The following colloquy ensued:

> JUROR NUMBER 9: I just wanted to know what is the role of a foreman in a jury deliberation?"
>
> THE COURT: Well, I read the instructions as part of my charge.  And when I sent in the written charge, it's contained in the charge.
>
> . . . .
>
> THE COURT: And I'll just give you the page reference.  You know the more I think about it, it's not actually part of the charge. Obviously, there's the charge I gave.  And after I speak with the attorneys, I can consider rereading what's referred to as the model charge says is the obligations and duty of the foreperson.[3]

---

[2] The record does not reflect that the judge directed the eleven jurors remaining in the jury room not to discuss the case until juror number 9 rejoined them.  Such a cautionary instruction is crucial to ensure the verdict reflects the considered judgment of all twelve jurors.  This stands in sharp contrast to the detailed instructions the judge gave the jury at the end of each day to refrain from discussing the case among themselves, even via any form of social media, and not to discuss the case until all twelve deliberating jurors were present.

[3] Rule 1:8-8(b)(2) provides:

(continued)

JUROR NUMBER 9: And if a juror member or members feel that the foreman is doing more than their actual role, how would that be mentioned.  Would that be - - would we bring that to your attention or how do you work - - or you work it out with the foreman?  How does that - - how do you handle that?

THE COURT: Well, I would want to speak to the attorneys first.  But once again, I will read the duties and responsibilities to the foreperson as I read before - -

JUROR NUMBER 9: Okay.

THE COURT: - - just telling these are your responsibilities.  And if there's a concern by the jurors, you can send me a note.

JUROR NUMBER 9: Okay.

THE COURT:  All right?  Does that answer your question?

JUROR NUMBER 9: Yes, it does.  Thank you.

---

(continued)

In criminal cases, the court shall submit two or more copies of its final instructions to the jury for the jury's use in the jury room during deliberations.  The court may, however, dispense with the submission of the jury instructions in writing if it finds that preparation of written instructions will cause undue delay in the trial.

[(Emphasis added).]

It is the trial judge's obligation to ensure the written charges submitted to the jury during deliberations contain the same language as the charges read to the jury in the courtroom and are otherwise complete in every respect.

A-3458-13T1

THE COURT: Okay. Thank you. You're excused.

[(Emphasis added).]

After juror number 9 left the courtroom, the judge asked both attorneys if it was necessary to reread the description of the foreperson's duties and responsibilities he had read to the jury earlier that same day. Although the prosecutor did not take a definitive position, he did emphasize that if the court decided in favor of this course of action, the instructions should be reread to the entire jury. The prosecutor also made the following prescient observation:

> We're working kind of blind. Obviously, we just know what Juror 9 has told us. I guess, just thinking out loud, <u>my concern if the [c]ourt does reiterate that, if there's an undercurrent in there, that's going to bring it right to the surface</u>. . . . Maybe that does need to be read. As I think out loud, I think because the concern has been raised by one of the jurors that it does need to be addressed.

[(Emphasis added).]

Defense counsel opposed rereading the instructions on the role of the foreperson to the jury. Echoing the concern initially mentioned by the prosecutor, defense counsel noted:

> I think there are several problems with bringing the jury back into remind them of the role of the jury foreman. I mean the jury foreman is going to be there and is going to hear this again. And is going to be basically reminded of her duty in front

20

of 12 other jurors which <u>is sort of almost</u> <u>like an admonition that she's not doing her</u> <u>job</u>. If the woman who just came in has concerns with how the jury foreman is doing her job, they should work it out in the jury room.

[(Emphasis added).]

The trial judge conceded that based only on juror number 9's account, it was "somewhat speculative as to what's going on." To avoid the potential of undermining or embarrassing the foreperson and to avoid the appearance that the court was taking sides in some unknown conflict among jurors, both attorneys recommended the judge simply send into the jury room the written description of the foreperson's role without further comment. The judge agreed.

The judge excused the jury for a fifteen-minute afternoon break. Thereafter, the jury returned to the courtroom to hear the playback of N.A.'s testimony, which took approximately ninety minutes. It was 4:10 p.m. at the conclusion of the playback. The judge decided to send the jury home for the day without giving them the written charge on the role of the foreperson. The judge informed the attorneys that after reading the comments to <u>Rule</u> 1:8-4, he had discovered this court's decision in <u>Barber v. ShopRite of Englewood & Assocs., Inc.</u>, 406 <u>N.J. Super.</u> 32, <u>certif. denied</u>, 200 <u>N.J.</u> 210 (2009). Although noting <u>Barber</u> was a civil case, the judge told counsel he wanted

to read it overnight because he may decide not to send anything further to the jury.

B

SECOND DAY OF DELIBERATIONS

The jury began its second day of deliberations on October 30, 2013, without any written instructions on the role of the foreperson. Approximately thirty minutes after deliberations had begun, the trial judge advised counsel the jury had sent out two simultaneous notes. The first note came from the foreperson and stated: "Your Honor, Juror Number 1 needs to discuss with you conduct and discussions occurring by some jurors." The second note was also signed by the foreperson. However, as the judge noted, it was on behalf of a total of nine jurors consisting of jurors numbers 10, 7, 8, 11, 3, 14, 9, 4, and 2; the note stated: "Your Honor, jurors need to speak to Judge re deliberations."

The judge decided to bring out the foreperson first alone, telling counsel that he would remind her that,

> there can be no discussion in court about, you know, where they may lie in terms of voting for guilt or innocence but hear what she has on her mind, and then bring the second group, the nine people she identifies and, in effect, tell them that I could select one of them to be the representative or spokesperson or they could indicate to the [c]ourt which one of the nine which [sic] is to speak. And obviously then I

22

would give whoever is the representative I end up speaking to, I will obviously say to the other jurors, is there anything else which you think needs to be added.

Neither the prosecutor nor defense counsel objected to this approach.[4] The following colloquy reflects the judge's interaction with the foreperson:

> THE COURT: Good morning. You may be seated. All right. Juror Number 1, I brought you in because you just sent me two notes and I'll read them for the record.[5] . . .
>
> Now, let me advise you, I don't want to hear anything from you about where the jury stands in voting guilt or innocence. That's off limits. And I know from the note that came to me yesterday, I know you've been having a lively discussion and that's typical and that's expected. <u>But obviously I and the attorneys are hopeful that this jury can reach a unanimous verdict as to the four counts. That's the hope in every criminal case. But within those parameters and knowing what's off limits, you can tell me what you think I should need to know to try to move this towards a verdict</u>.
>
> JUROR NUMBER 1: We have been deliberating in earnest but information is being brought in that should not be brought in, information that was not discussed in this courtroom, some suppositions, what ifs, different scenarios that I think is totally inappropriate in discussing in deliberations. More - - and in addition

---

[4] Once again, the record does not reflect that the judge directed the eleven jurors remaining in the jury room not to discuss the case while the foreperson was absent.

[5] The trial judge read the contents of the notes into the record.

that's troubling is the conduct of some of the jurors in trying to sway the opinion of the others to the point of slamming pens down on the table, turning away from the other juror because you're not allowing them to speak. It's gotten a little nasty, to put it lightly.

. . . .

THE COURT: Okay. Okay. Well, every foreperson generally has a difficult job to do and yours is especially difficult because, you know, the evidence has led some jurors in one direction and other jurors in another direction. And, you know, I know you understand your responsibilities. It sounds like you're conducting them to the best of your ability and this - - and the evidence is such where reasonable minds can differ. And I say that because that's true of almost any case.

My thought is you identify nine additional jurors. I was going to bring those nine in and ask them, you know, if there's one person they would like to identify as a spokesperson who can, you know, presumably say what's on their mind. Any reason why I should not to do that?

JUROR NUMBER 1: No, Your Honor.

[(Emphasis added).]

At this point, the judge asked the foreperson if she had any suggestions she could give him to assist her "in leading the deliberations." In response, the foreperson directed the judge's attention to the written jury charges that had been given to the jury to take inside the jury room during deliberations and focused on the part that reads: "It is your

24 \qquad A-3458-13T1

duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment."  The judge then confirmed that the foreperson wanted him to reread this language in the charge to the jury.  Thereafter, juror number 1 told the judge the following:

> JUROR NUMBER 1:  And, Your Honor, the last comment as an example of pointing to this and us not deliberating or attempting to intimidate was a question that was just asked, are you afraid of retaliation.  And, you know, again, that's an example of things that aren't appropriate and should not be entering into our deliberations.  How you can get folks to just stick with the facts, I've been trying but now I'm getting some strong resistance.

> THE COURT:  Okay.  And I'm asking the question just because of what you just said, would you like to continue as the foreperson?

> JUROR NUMBER 1:  Yes.

After confirming with the "Senior Sheriff's Officer" that the remaining eleven jurors were in the jury room, the judge asked the foreperson to wait in another room while he discussed the matter with the attorneys.  Based on the foreperson's comments about retaliation, the prosecutor was concerned about matters extraneous to the evidence presented at trial affecting the deliberations.  After referring to the language in the jury charges highlighted by the foreperson, defense counsel was

concerned a group of jurors were conducting themselves in a manner to intimidate and coerce other jurors into voting to convict defendant. Defense counsel speculated that the foreperson may be one of the jurors who is being targeted for retaliation by this faction. The judge expressly stated he was withholding any conclusion until he heard from the group of nine jurors.

The nine jurors identified in the second note were brought into the courtroom and seated in the jury box. The foreperson was in a separate room by herself and two jurors remained in the jury room. Thus the jury was now fractured into three separate and isolated groups. After the judge read the two notes to the group of nine, the following colloquy ensued:

> THE COURT: What I'd like to ask is to begin by speaking to one of you as, in effect, the spokesperson and I can select one of you or you can - - you can agree among yourselves who would like to speak and it seems like, from the show of pointing, that you have a spokesperson and I'm going to hear from Juror - -
>
> JUROR NUMBER 10: Ten.
>
> THE COURT: - - 10 . . . after I have the exchange with Juror Number 10, if any of you, the remainder of you, feel that you have [] new [information] to add that Juror Number 10 has not apprised me of, I will give you that opportunity.
>
> So Juror Number 10, tell me what's on your mind.

A-3458-13T1

. . . .

PROSECUTOR: I'm sorry, Juror Number 10. Your Honor, before we begin, could we just caution the gentleman?

THE COURT: Oh, yes. I'm sorry. You're right. Certain things are off limits. You're not allowed to tell me, nor any juror, where you stand. I don't want to know who's in favor of conviction, who's in favor of not guilty, and <u>where you stand in terms of numbers</u>. <u>That's off limits</u>.

JUROR NUMBER 10: I understand.

. . . .

It's the conduct of the foreperson starting yesterday morning. She's been disrespectful pretty much to everybody who's on the bench here.[6] I was told to shut up when I was trying to voice an opinion. I believe then there's been other issues where she's unwilling to deliberate and when we try to bring up deliberations, she sat there in a corner, not willing to participate, just fold her arms, saying I've mentioned - - I've discussed things already, I'm not willing to go any further. And it just - - from yesterday morning, probably around ten-thirty, it's just been beating heads against the door. She's not willing to listen to a discussion. She's not willing to speak nicely to anybody. And it was like that yesterday and it's got like that again today. She's treating us like we're her five year old kids, pretty much how you can put it down.

---

[6] We presume this was a reference to the eight jurors sitting in the jury box.

A-3458-13T1

<u>And then there was - - there was one other thing that I don't know if you want me to do it sidebar or if you want me to bring it up now that happened last week</u>.

THE COURT: That happened last week?

. . . .

JUROR NUMBER 10: Yes. It's something that happened and I - -

THE COURT: Well, let me ask you this. Whatever you want to tell me, is it known, as far as you know, to the other jurors?

JUROR NUMBER 10: Same jurors were in the room and the same conversation took place. Yes.

THE COURT: So other jurors - - whatever you want to tell me, some other jurors were present?

JUROR NUMBER 10: You know what I'm talking about? Everybody know?

UNKNOWN JUROR: Yes.

JUROR NUMBER 10: Who was in the room at the time?

UNKNOWN JUROR: I believe you were.

JUROR NUMBER 10: [Refers to another juror by her first name]?

THE COURT: So you and two other jurors - - I mean, the reason, if you're the only one who knows it, I will bring you to sidebar.

[(Emphasis added).]

From this point forward, juror number 10 ceased to be the "representative" or "spokesperson" of the group of nine jurors

28

because the views he expressed to the judge were based exclusively on his personal account of what transpired. The following colloquy took place entirely at sidebar.

> THE COURT: [Addressing juror number 10] All right, sir. Go ahead.
>
> JUROR NUMBER 10: So last Friday during lunchtime, we were sitting in the meeting room and we were discussing multiple things, just as we do, nothing about the case. Then Juror Number 1 mentioned that her - - we were talking about mold remediation . . . and then she starts talking about how her neighbor's house, in 2007, was set on fire.
>
> . . . .
>
> . . . [A]nd I'm unclear whether it was a police officer or a neighbor said to her, well, this could be retaliation for how you treat the drug dealers on the street and she said . . . this could be based on the fact that she sees drug dealers on the street and she goes and knocks on their window and tells them to move on, move down the street. I thought it . . . was something that should have been raised straightaway. I let it go for a bit but based on comments that are coming out during the [deliberations][7] right now, it just seems like, based on the facts, that that could be an influence in her decision.
>
> That's my opinion. It's something that has been brought up this morning. . . .
>
> THE COURT: Other than that comment that you say Juror Number 1 made last Friday . . .

[7] Juror number 10 actually said "arbitration." However, it appears to us the juror simply misspoke and intended to say "deliberations."

once you started your deliberations yesterday - -

. . . .

has that type of comment by any juror been made?

JUROR NUMBER 10: There was a comment probably about half an hour ago that said is anybody afraid of retaliation in the case?

THE COURT: Referring to the jurors?

JUROR NUMBER 10: To the jurors based on whatever decision was made. Some people said yes, some people said no. And when she was asked, she didn't respond. And then when she was asked again, she didn't respond. And then somebody said, can you please respond, and she said no comment.

. . . .

. . . [T]hat's assuming - - that came up once.

PROSECUTOR: Was that before or after your notes got sent out?

JUROR NUMBER 10: That was . . . <u>we only thought there was one note that got sent out</u>. She wouldn't tell us what was in the second note. She sent that without telling anybody.

[(Emphasis added).]

In response to this allegation, the Judge handed the two notes to juror number 10. We note, however, that the judge had read the contents of both notes to all nine jurors when they were first seated in the jury box. After examining both notes,

juror number 10 identified the note that was signed by the group of nine jurors as the only note he and the other eight jurors had seen before.  At this point, juror number 10 clarified the extent of the jury's disunity by noting that two other jurors had refused to add their names to the note signed by the group of nine.

> JUROR NUMBER 10: And then, as soon as I said I want to speak to the Judge regarding misconduct and how you're treating people, these people just said I want to sign on, I want to sign on, I want to sign on.  It pretty much went all around the room.  There was [sic] others that just said too many are going in, we won't go, but everybody feels the same way.
>
> . . . .
>
> THE COURT: . . . and the other note, C-9, indicates Juror Number 1 would like to speak to the Court.
>
> . . . .
>
> She did not make that aware to you when - -
>
> JUROR NUMBER 10: We saw her.  We saw her write a second note.  We said please tell us what's on the second note and she licked the envelope and sealed it and went to the door and knocked.

At this point, the judge permitted the attorneys to question Juror Number 10.

> DEFENSE COUNSEL: . . . Sir, so there is a discussion in the jury room about a fear of retaliation?

31

JUROR NUMBER 10: It was mentioned based on the fact of what happened last week and the conversation about how someone told her that maybe it was retaliation for how she treated - - how she went outside and knocked on drug dealers' cars that we're assuming that she knew where (indiscernible) house and told them to move. Then one of the other jurors who [was] also part of hearing [sic] the conversation brought that up and said, okay, is anybody scared of retaliation because just based on the way it's been suggested - -

DEFENSE COUNSEL: Right.

JUROR NUMBER 10: - - it's been - - you know, that's why we came back in yesterday after an hour and said we're done, locked.

DEFENSE COUNSEL: Okay. So I'm trying to understand this correctly. <u>Was the issue of retaliation brought up by a juror other than Juror Number 1</u>?

JUROR NUMBER 10: <u>Yes</u>.

. . . .

DEFENSE COUNSEL: Okay. I appreciate your honesty. Thank you.

[(Emphasis added).]

Through a series of follow up questions by the prosecutor juror number 10 later clarified that the conversation concerning retaliation occurred during the lunch break. Moreover, "only a few" jurors were present when it occurred. After this point was clarified, defense counsel asked the judge to address an issue

outside the presence of juror number 10.  The judge responded as follows:

> THE COURT:  Okay. Before we do that, I have some questions and I do this because, number one, we're at sidebar, number two <u>because . . . you're the spokesperson.  Do you think there's anything I can do to assist the jury in ultimately reaching a unanimous verdict as to any one of the four counts</u>?
>
> JUROR NUMBER 10: No.  <u>I believe we have a group of people who are willing to deliberate except one</u>.
>
> THE COURT: Okay.  And is that - - <u>which juror</u>?
>
> JUROR NUMBER 10: <u>Juror Number 1</u>.
>
> THE COURT:  Do you think . . . Juror Number 1 was made the foreperson because of her seat, just by happenstance she was Juror Number 1?  You know, Juror Number 1, they're always asked do you want to be the foreperson?
>
> JUROR NUMBER 10: She gloated.  She gloated last week that she would be the foreperson of the trial.
>
> THE COURT:  Do you think you can - - you and all the other 11 deliberating jurors - - can have a discussion based upon the facts in the case, based upon the evidence, and that's the only thing, you know, you can decide this case on, the evidence you heard from the witness stand, exhibits marked into evidence, can be no speculation - -
>
>    . . . .
>
> no guessing?  Do you think discussion could or could not be more productive if there was a different foreperson?

A-3458-13T1

JUROR NUMBER 10: Yes.  But to be honest with you, it's - - it would - - <u>regardless of whether or not it's a different foreperson, it's whether or not that juror comes back into that room</u>. . . .

    . . . .

. . . because it's - - it won't go any further.

DEFENSE COUNSEL: You mean, as a - - I'm sorry, Judge.  As a juror, as opposed to a foreperson?

JUROR NUMBER 10: There's 11 other jurors in there and right now all 11 of us feel like we've tried to do - - we've tried to go back and forth, discuss different points, and it's only  11 of us going through this so it's an 11 person jury since yesterday morning at nine-thirty.

THE COURT:  So the bottom line is you feel Juror Number 1 does not want to engage in reasonable discussion?

JUROR NUMBER 10: The first thing she said this morning - - somebody asked a question.  One of the things that she said is, I'm going to say this once and then I'm done for the day.

    . . . .

DEFENSE COUNSEL:  Is the jury or any members of the jury considering facts that have not been presented as evidence?

JUROR NUMBER 10: I would say there are scenarios that are coming up that have not been presented as evidence that Juror Number 1 is bringing up.  Yes.

DEFENSE COUNSEL: And only from Juror Number 1?

JUROR NUMBER 10: Yes.

. . . .

DEFENSE COUNSEL: Do you feel that you've sort of given us an understanding that has been sort of distilled from your fellow jurors in a box?

JUROR NUMBER 10: If you polled every single person in that room, you would get the same comment. Prior to me coming in, I was sitting closest to Juror Number 1 when I heard the discussion that I mentioned previously . . . so I proposed that I would be the spokesperson for the group based on that. And I think it was after I was told to shut up this morning and then other people's comments were being brushed off and it was as though the foreperson was, it's her way or the highway. But I believe every single person that you polled, they would give you the same response that I did.

. . . .

THE COURT: Based on your discussions of deliberations yesterday and today, do you believe any jurors - - when I say that, all 12 - - do you believe any juror has tried to intimidate another juror?

JUROR NUMBER 10: No.

. . . .

THE COURT: And the fact only nine came in, not 11, do you - - what do you attribute the fact that two jurors had decided not to come in, if you know?

JUROR NUMBER 10: I do.

35

THE COURT: I don't want you speculating.

JUROR NUMBER 10: One of them was just, okay, there's enough of you guys in, I don't need to be a part of it, and just put his head in his hands and said, let's get this over with. And then another one was - - just didn't say anything. Just - - she saw the nine of us going in and that was it.

[(Emphasis added).]

The record reflects the judge initially directed juror number 10 to rejoin the other eight jurors seated in the jury box to discuss the matter privately with the attorneys. Thereafter, the judge informed counsel he wanted to make sure none of the eight jurors who were not privy to the lengthy sidebar discussion with juror number 10 wanted to speak to him about any issue concerning deliberations. As the judge phrased it: "I'm going to give them that invitation." Both attorneys approved this approach.

Defense counsel also wanted to hear from the two other jurors who decided not to join the group of nine. However, the judge was willing to rely on juror number 10's description of these two jurors' reaction to the group's initiative to contact the court. Again, quoting the judge: "Well, we heard the reasons from . . . juror number 10." Defense counsel pressed the issue by noting that according to juror number 10's representations: "But the one juror was silent." Although the

judge responded "I agree," he took no action to hear directly from these two jurors.

The judge then addressed the nine jurors seated in the jury box:

> THE COURT: All right. Ladies and gentlemen, and again I'm addressing the nine jurors in the box, I had a discussion with the attorneys, extensive discussion with Juror Number 10, and you identified him as a spokesman, he was very [eloquent]. I just don't want to preclude - - [if] anyone feels they wish to address me and the two attorneys at sidebar, you can. Now, I know you didn't hear everything that Juror Number 10 said at sidebar but does any one of you feel strongly you would like to talk to me about deliberations? Again, there can be no discussion about how anyone is leaning towards a - - on a verdict or anything of that nature.
>
> [The record indicates no verbal response.]
>
> THE COURT: Okay. Well I don't see any hands. I'm going to ask that the nine of you go back into the room. Your beverage has arrived so obviously when the beverage arrives, there's no deliberations and obviously, unless you have 12 together, there's no deliberations. So let's take . . . a 15 minute break. No deliberations.
>
> [(Emphasis added).]

After the nine jurors left the courtroom, the prosecutor addressed the court with his assessment of juror number 10's account of events. He proposed the court reinstruct the jury concerning its duty to decide the case based only on the

evidence presented at trial, and not on comments made by a fellow juror based on his or her particular life experience or any similar extraneous matter.  The prosecutor also suggested the judge's instructions should not assess blame or imply that any individual juror is responsible for the jury's alleged inability to deliberate with civility and respect for opposing points of view.

> THE PROSECUTOR:  I don't think any fingers need be pointed in that discussion. Everyone should hear it because I doubt we're getting the full story from what looks to be the two sides in this jury room, but . . . they essentially have to act like adults.  They have to get past it and they have to talk about the case.  And if they can't reach a verdict, they can't, but I think they need to have the opportunity and maybe just a refresher on what their job is is going to help them do that.

The trial judge asked both attorneys whether, based on juror number 10's account of events, they believed "Juror Number 1 should continue as the foreperson."  Both defense counsel and the prosecutor expressed skepticism about the court's authority to remove juror number 1 as the foreperson of the jury.  Defense counsel in particular returned to the issue of retaliation, noting "juror number 10 indicated that there was a polling in the jury room about whether each juror feared retaliation."

On this basis, defense counsel moved for a mistrial or alternatively for the trial judge "to read the deliberations

charge" when the jury returned from the break. In response to the judge's request for clarification, both attorneys confirmed the "retaliation" at issue did not involve "one juror against another." The retaliation allegedly discussed among the jurors concerned "their day to day lives, if in fact they return one verdict and not another verdict . . . ." It was the type of retaliation that occurs "outside the courthouse."

Once the issue of retaliation was properly framed by the parties, the trial judge returned to the tension between juror number 10 and the foreperson. After restating the conflicting accounts given by jurors 1 and 10 as to who was responsible for the state of incivility in the deliberative process, the trial judge decided to bring the twelve deliberating jurors and the alternate into the courtroom, and reread to them the part of the charge that describes their duty as jurors

> to weigh the evidence calmly, without passion, prejudice, or sympathy. Any influence caused by these emotions has the potential to deprive both the State and the defendant of what you promised them, a fair and impartial trial by fair and impartial jurors. Also speculation, conjecture, and other forms of guessing play no role in the performance of your duty.

The judge also intended to recharge the jury on the role of the foreperson. He planned to reiterate and emphasize that juror number 1 was designated foreperson by virtue of occupying

a seat number in the jury box. He also planned to supplement the model charge with the following language taken directly from our decision in Barbe, supra:

> [The] foreperson['s] . . . role [is] to maintain order in the deliberations, marshal the jurors' votes on the issues presented on the verdict sheet and to render the verdict on behalf of the jurors. Otherwise, the jury foreperson is only one vote of six and his opinions have no greater weight than those of the other jurors. It is not the role of the foreperson to explain legal concepts to the other jurors.
>
> [406 N.J. Super. at 56 (citations omitted).]

Finally, the "last thing" he intended to read to the jury was a modified version of the standard charge on the role of the foreperson, deleting the language that informs the foreperson: "it is your responsibility to lead deliberations. It is also your responsibility to tell us what the verdict is when the jury has reached it."

After informing counsel of this decision, the judge denied defendant's motion for mistrial "without prejudice." Noting for the record that the previous day the jury had sent out a note indicating their deliberations had reached an impasse, the judge told the attorneys he planned to read the charge entitled "Judge's Inquiry When Jury Reports Inability to Reach Verdict" approved by the Supreme Court on June 30, 2013, three months before the start of the trial.

At the end of this lengthy interlude in deliberations, made even longer by the discussion that followed juror number 10's sidebar revelations concerning retaliation, a Sheriff's Officer reminded the judge that Juror Number 1 had been kept alone in a room, separated from the rest of the jury during the entire time.  The judge decided to reconvene the jury after a fifteen-minute recess and instructed the Sheriff's Officer accordingly.  At the end of the recess, the judge brought the foreperson into the courtroom by herself and again described to her "the responsibilities of the foreperson."  The judge then addressed juror number 1 directly as follows:

> THE COURT: Based on everything you know, do you think you can carry out that responsibility?  In other words, lead deliberations, give everyone a chance to speak . . . and see if you can develop a consensus. Obviously, I know when I had you here a little while ago, you told me your concerns and I'm concerned for your concerns.  Let me ask you once again, do you think you would like to continue this responsibility of leading deliberations and give everyone a chance to speak up and discuss it in a meaningful manner?
>
> JUROR NUMBER 1: Yes, but may I ask a question?
>
> THE COURT: Absolutely.
>
> JUROR NUMBER 1:  When - - but when it gets beyond the scope of what we were to do, how would you -

A-3458-13T1

In response, the judge informed the foreperson he planned to recharge the jury regarding their duty not to "speculate, conjecture, [or engage in] other forms of guessing" about matters outside the evidence presented at trial. He emphasized that the verdict must be based on the evidence and must be unanimous. The judge then again asked juror number 1: "[D]o you feel . . . you can lead deliberations in a meaningful manner?" She responded: "Yes."

After the twelve deliberating jurors were seated in the jury box, the judge again instructed them at length about the manner the foreperson is selected as described in <u>Rule</u> 1:8-4 and her role and responsibilities in this capacity. With respect to the verdict sheet, the judge informed the jurors that "<u>until you can come to a unanimous verdict on Count 1, there's no reason to go to Count 2, 3, and 4, and I know you figured that out</u>." (Emphasis added). The judge also noted his concern regarding the note the jury had sent out the previous day, reporting they were unable to reach a unanimous verdict on Count 1. After noting the jury had not sent out a similar note that day, the judge asked the jury the following question:

> But ladies and gentlemen, do you feel that
> further deliberations will be beneficial or
> do you feel you've reached a point at which
> further deliberations will be futile?  I'm
> going to ask you to return to the jury room
> and confer and advise me in a decision in

> another note as to whether you wish to
> continue deliberating or whether you feel
> that would be completely nonproductive.[8]
> And I ask the foreperson, whenever you send
> a note to me, always read it to your fellow
> jurors so everyone can know exactly what's
> being sent to me, if there's any - -
> because, obviously, I want the note to
> represent the thoughts of all 12.    All
> right.

After the passage of an unknown period of time, the judge received two more notes from the jury.  Although both notes were written and signed by the foreperson, one note conveyed the following message from juror number 7: "Your Honor, Juror Number 7 would like to talk to you re instructions on deliberations." The second note read: "Your Honor, we have reached an impasse. Eleven jurors want to continue deliberation.  One juror does not want to continue deliberations."  After conferring with counsel, the judge decided to address first the concerns expressed by juror number 7.

It is important to emphasize that juror number 7 was one of the nine jurors who sought to speak to the court earlier in the day "re deliberations."  However, by selecting a "spokesperson" to speak for the group instead of speaking directly with each

---

[8] The judge's instructions here were a verbatim recitation of the language in the model jury criminal charge entitled: "Judge's Inquiry When Jury Reports Inability to Reach Verdict," approved by the Supreme Court on June 30, 2013.

individual juror, the court never heard her actual views on the subject.

THE COURT:  Tell us what's on your mind?

JUROR NUMBER 7: Your Honor, you just read to us a whole bunch of - -

THE COURT:  Instructions.

        . . . .

JUROR NUMBER 7:  And one of it was that we had to keep an open mind and I thought that was very important for us once we're going back into that room and I just didn't know how to approach that because there are some people in the room who will not - - who do not want to keep an open mind and who have emphatically said that they will not keep an open mind and that just upsets me because we are very insistent to do justice and I think if it's your instructions for that, . . . I just felt I had to bring it to your attention.

THE COURT:  Is there anything you can suggest to the [c]ourt, other than what I've already done, and we've read some instructions giving you additional . . . instructions, anything else that comes to mind?

JUROR NUMBER 7: I cannot and that's why I'm coming to you.

        . . . .

And that's how a majority of us do feel, that we are willing to keep an open mind. We are willing to talk and it's so hard that when someone just comes back to you and says, no I'm not.

> THE COURT: Let me ask you this. I heard from Juror Number 10 before, as well as Juror Number 1, separately. The [c]ourt has some <u>limited discretion in terms of appointing a different foreperson. Do you think discussions would be more productive leading to a possible verdict if there was a different foreperson</u>?
>
> JUROR NUMBER 7: Well, yes and no. Yes, because I think we might be able to . . . try and discuss and have it in a non-confrontational way; no because I think the juror who has emphatically said no, they don't want to do it is not going to change their mind . . . . I personally posed the question that why can we not talk about this, even if it means that we have to talk for 150 times, because maybe the 151st time, some - - a phrase that you may say might open the lightbulb, whatever, and the juror came back and said no.
>
> [(Emphasis added).]

After excusing juror number 7, the judge discussed with the attorneys the note indicating the jury had reached an impasse. After acknowledging the eleven-to-one status of the jury's deliberations, the prosecutor declined to characterize the situation as "futile." The prosecutor argued the "11 people in there willing to try" deserved "a chance to talk to the individual . . . who has indicated that they don't want to review the facts of the case . . . ." Citing our decision in <u>State v. Rodriquez</u>, <u>supra</u>, the prosecutor suggested the court consider removing juror number 1 as the foreperson of the jury

and appoint or have the jury elect a different juror as foreperson.

The prosecutor conceded that "Rule 1:8-4 does not contemplate the replacement of a [jury's] foreperson." He nevertheless argued it was "within the ambit of the judge's discretion, particularly in light of [Rule] 1:1-2 which authorizes relaxation of the rules to appoint a new foreperson where there were obvious difficulties with a member of the jury originally designated." According to the prosecutor, an individual juror who refuses to continue deliberating after the second day of deliberations "is prejudicial to both the defense and the State, and if that can be overcome, then we should be able to get a verdict."

Defense counsel urged the trial judge to declare a mistrial because the jury had announced it was "deadlocked." Defense counsel argued:

> Eleven people are willing to continue and one is not. So that is an impasse and the instruction that the [c]ourt read to them before they went out was to go back, try to confer, and then advise of your decision in another note. Another note came out, we're at an impasse, and I think the appropriate thing to do now is to declare a mistrial.

The trial judge denied defense counsel's application for a mistrial and decided to replace juror number 1 as foreperson. Acknowledging Rule 1:8-4 is "silent on the issue of replacing

the foreperson," the judge nevertheless found support for this decision in Rodriquez. The judge specifically cited Rodriquez's reliance on Rule 1:1-2 as justification for relaxing the mechanism for the designation of a foreperson under Rule 1:8-4 "where there were obvious difficulties with the member of the jury originally designated." Rodriquez, supra, 254 N.J. Super. at 350.

Focusing on the "obvious difficulties" required to remove juror number 1 as foreperson, the trial judge made the following findings:

> In terms of difficulties, when I heard Juror Number 10 at sidebar, he indicated the foreperson was somewhat of an obstructionist in permitting deliberations go forward. She was not leading deliberations as I charged her to do. So for that reason, I am going to appoint someone else . . . .

Defense counsel objected to the replacement and argued for a mistrial, especially in light of juror number 7's allegations that there "were some people among or in the jury who will not keep an open mind." Both attorneys suggested if the court was inclined to replace the foreperson, it should be left to the jurors to elect. When the jury returned to the courtroom, the judge acknowledged receipt of the note from juror number 7 and the other note indicating the jury was at an "impasse," with

47                                              A-3458-13T1

eleven jurors wishing to continue deliberating, and one juror not willing to go any further.

The judge also mentioned the time consumed to respond to the various notes sent by both the jury and individual jurors, meant the jury had not had a long time to actually deliberate. He had thus decided to give the eleven of twelve jurors the opportunity to continue deliberating after lunch. The judge then made the following statement:

> Also, I'm making a decision to have a different foreperson and I say that, Juror, not in criticism of you. I just say sometimes it's good to hear from another voice so I don't want you to take it as criticism. Whatever your convictions are are your convictions, whatever 12 of you, your convictions are. I've, you know, read the instructions over this morning as to how you're to conduct your deliberations and you have a copy of the charge with you . . . . Look at that to assist you.
>
> As you know, any verdict can be based solely on the evidence you've heard from the witness stand, the exhibits marked into evidence. Anything else is not material, not relevant, to your deliberations and ultimately hopefully a unanimous verdict. But in general I'm following a general rule and, for whatever reason - - let's say Juror Number 1 had been selected as an alternate. You go right down the row. So following that, Juror Number 2, I'm going to ask you if you would be willing to take on the responsibilities of a foreperson and, again, I can review with you responsibilities. Would you be willing to take on those responsibilities?

JUROR NUMBER 2: Yes.

Deliberations resumed after the lunch recess.[9] The jury sent out a note at 2:39 p.m., requesting a playback of parts of N.A.'s testimony. The judge advised the attorneys he planned to send the jury home "at four o'clock, right on the dot." As the judge was about to reconvene the jury to announce the recess for the day, the jury sent out another note requesting "to hear the testimony of Officer Pope and DEA [Agent] Brown." The judge informed the jury they would hear the playback the following day and recessed for the day. We pause to note that the courtroom where this case was tried was equipped with video recording equipment. Thus, the playback enabled the jury to see and hear the witnesses.

<u>C</u>

<u>THIRD DAY OF DELIBERATIONS</u>

The final day of the trial began with an hour delay in arranging the playback of Pope's and Brown's testimony. Although the note from the jury simply requested to replay "the testimony" of these two witnesses, the judge did not make any

---

[9] In the interest of completeness, the record shows the alternate was returning to the jury room and joining the deliberating jurors during the various recess periods. The judge questioned the alternate when defense counsel brought this irregularity to his attention. The alternate told the judge he had not discussed any aspect of the case with the deliberating jurors.

A-3458-13T1

attempt to narrow the scope of the request. Once the twelve jurors were seated in the jury box at 10:10 a.m., the judge told the jury the court clerk estimated the playback of Pope's entire testimony "could be as long as two-and-a-half hours." The playback of Brown's entire testimony would take approximately forty-five minutes. The judge told the jury he foresaw "going for about two hours, because I think that's your limit . . . ." A one-hour lunch recess was scheduled to start at twelve noon and the jury would then reconvene to hear the remaining part of the playback.

After the playback was complete, the jury would resume deliberations. However, the judge informed the jury that "because of a commitment I have unless I get word from you otherwise . . . I'm going to be sending you home a little before 3:30 [p.m.] today." The judge also suggested the jury could resume deliberations after Pope's playback was completed; they could then break again to view Brown's playback, and resume deliberations after Brown's playback was completed.

The playback did not proceed as the judge expected. After an unexpected bathroom break, the judge decided to send the jury back at the end of Pope's playback around 12:05 p.m., "to deliberate for a short while before you have [your] lunch break." Acknowledging the jury had requested a playback of both

Pope's and Brown's testimonies, the judge nevertheless decided to

> give you a short time, if you decide you want to deliberate over what you heard so far, or you could send me a note, no, we want to come right back into court, as you indicated late yesterday, before we had a late start today of Mr. Eric Brown.
>
> Either way, you're going to be either be deliberating in the jury room or in the court listening to additional playback you've requested until about 12:30 [p.m.]

When the jury left the courtroom, the judge told the attorneys he decided to take this measure because he believed the jury was tired after viewing and listening to two hours of video playback testimony. The jury reconvened after lunch and requested to view the playback of Agent Brown's testimony. The playback ended at 2:25 p.m., at which time the court again recessed to allow the jury a beverage break.

After the passage of an undisclosed amount of time, the jury sent out a note reporting they had reached a unanimous verdict.

II

Against this record, defendant now appeals raising the following arguments:

POINT I

THE DEFENDANT'S FEDERAL AND STATE CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW

AND TO A FAIR AND IMPARTIAL JURY WAS VIOLATED.

A. THE JURY DELIBERATIONS WERE IRREMEDIABLY TAINTED BY A JUROR'S PERSONAL ACCOUNT OF A BURNING HOUSE RESULTING FROM DRUG DEALER RETALIATION, FOLLOWED BY A DISCUSSION AMONG JURORS ABOUT THEIR PERSONAL FEARS OF DRUG DEALER RETALIATION.

B. THE TRIAL COURT FAILED TO VOIR DIRE A JUROR WHO REPORTED THAT HE JUST WANTED TO "GET IT OVER WITH" AND FAILED TO VOIR DIRE OTHER JURORS WHO REPORTED THEY FEARED DRUG DEALER RETALIATION.

C. THE TRIAL COURT'S INSTRUCTION TO THE JURORS ADVISING THEM TO CONTINUE THEIR DELIBERATIONS WAS ERRONEOUS AND PREJUDICIAL. (Not Raised Below)

D. A TRIAL PROCEDURE IN WHICH JURORS IGNORE INSTRUCTIONS AND INJECT EXTRANEOUS MATTERS INTO THE DELIBERATION PROCESS UNDERMINES PUBLIC CONFIDENCE IN THE ADMINISTRATION OF JUSTICE. (Partially Raised Below)

POINT II

THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUION AND ART. I, PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE PROFFER OF EXTRAORDINARILY PREJUDICIAL TESTIMONY PERTAINING TO THE DEFENDANT'S ALLEGED DRUG "NETWORK" AND "ASSOCIATES."

POINT III

THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW
AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO
THE UNITED STATES CONSTITUTION AND ART. I,
PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS
VIOLATED BY THE TRIAL COURT'S RULING BARRING
THE DEFENDANT FROM PRESENTING A COMPLETE
DEFENSE.

    A. THE FACT THAT THE POLICE
    FOUND NO EVIDENCE OF DRUGS OR
    DEALING WHEN THEY SEARCHED THE
    DEFENDANT'S ALLEGED DRUG NUISANCE
    HOUSE WAS RELEVANT AND PROBATIVE
    OR WHETHER THE DEFENDANT HAD
    MAINTAINED A DRUG NUISANCE
    PROPERTY AT THAT LOCATION.

    B. THE FACT THAT THE LONE
    WITNESS TO THE ALLEGED DRUG
    TRANSACTION WAS NOT PROSECUTED FOR
    POINTING A GUN AT A POLICE OFFICER
    WAS RELEVANT EVIDENCE OF BIAS AND
    SHOULD HAVE BEEN ADMITTED.

POINT IV

THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW
AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO
THE UNITED STATES CONSTITUTION AND ART. I,
PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS
VIOLATED BY THE ACCUMULATION OF TRIAL
ERRORS. (Partially Raised Below)

POINT V

THE SENTENCE IS EXCESSIVE.

    A. THE TRIAL COURT IMPROPERLY
    BALANCED THE AGGRAVATING AND
    MITIGATING CIRCUMSTANCES.

    B. THE TRIAL COURT MADE FINDINGS
    OF FACT TO ENHANCE THE SENTENCE.

In his pro se supplemental brief, defendant raises the following additional arguments:

POINT I

A DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. I, PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE TRIAL COURT'S RULING BARRING A DEFENDANT FROM PRESENTING A COMPLETE DEFENSE

A. THE FACT THAT THE POLICE VIOLATED THE FOURTH AMENDMENT TO SEARCH A DEFENDANT'S ALLEGED DRUG NUISANCE HOUSE WAS RELEVANT

B. THE FACT THAT THE BODY WIRE RECORDING COOPERATED WITH THE DEFENDANT'S TESTIMONY WAS RELEVANT

We agree with defendant that the jury's deliberative process was irreparably tainted by the strife that developed between the foreperson and a group of nine jurors. This discord overwhelmed the deliberative process with extraneous matters and irreparably undermined the reliability of the verdict. The steps the trial judge took to address this situation, while well-intended, impermissibly intruded into the jury's autonomous role as judges of the facts. Our analysis is guided by the following principles:

[A defendant's] right to a jury trial is one of the founding principles of our Republic and is guaranteed by both the Sixth Amendment of the Constitution of the United States, United States v. Gagnon, 470 U.S.

54

A-3458-13T1

522, 526, 105 S. Ct. 1482, 1484, 84 L. Ed. 2d 486, 490 (1985), and Article I, Paragraph 10 of the New Jersey Constitution, State v. A.R., 213 N.J. 542, 557 (2013). As the guardian of that guarantee, the trial judge is entrusted with the responsibility of controlling courtroom proceedings and is bounded by the law and the rules of the court. State v. Tedesco, 214 N.J. 177, 188-89 (2013).

A jury verdict must be guided by correct legal instructions from the trial judge and unaffected by matters extraneous to the evidence presented at trial. Thus, "[e]rroneous instructions on matters material to the juror's deliberations are presumed to be reversible error." State v. Allen, 308 N.J. Super. 421, 431 (App. Div. 1998) (quoting State v. Grunow, 102 N.J. 133, 148 (1986)). Although granting a mistrial in a criminal case "is an extraordinary remedy[,]" the trial judge is bound to grant this relief when it is necessary "'to prevent an obvious failure of justice.'" State v. Yough, 208 N.J. 385, 397 (2011) (quoting State v. Harvey, 151 N.J. 117, 205 (1997)).

The role of the jury as the judges of facts is predicated on the integrity of the deliberative process. State v. Corsaro, 107 N.J. 339, 346 (1987). In those cases where the jury announces an inability to reach a unanimous verdict, the decision whether to grant a mistrial turns on whether the duration of the deliberations balanced against the length of the trial and the complexity of the proofs shows the jury has made a good-faith effort to reach a sustainable verdict. See State v. Ramseur, 106 N.J. 123, 300-05 (1987), cert. denied, 508 U.S. 947, 113 S. Ct. 2433, 124 L. Ed. 2d 653 (1993). Beyond this, any further direction from the judge to continue deliberations, especially in the absence of

a reminder of the right to return a non-unanimous verdict, could be viewed as coercive. Figueroa, supra, 190 N.J. at (citing State v. Hunt, 115 N.J. 330, 382-85 (1989)).

In determining the propriety of a trial court's response to a jury's inability to reach a unanimous verdict, our Supreme Court has identified two principal concerns: (1) whether the supplemental instruction has the capacity to improperly influence the dissenting jurors to change their votes; and (2) whether "the weighty role that the judge plays in the dynamics of the courtroom" improperly coerced the jury into returning a verdict. Id. at 237-38.

[State v. Dorsainvil, 435 N.J. Super. 449, 480-81 (App. Div. 2014).]

Depending on the circumstances, "even a general inquiry by the judge about deliberations may present the possibility of coercion." Figueroa, supra, 190 N.J. at 238. Adhering to these principles, we have also condemned any measures taken by a trial judge to "'undo a jury deadlock' by 'focus[ing] upon possibly the weakest links in the chain locking the jury in disagreement, namely, the minority holdouts on the jury.'" State v. Nelson, 304 N.J. Super. 561, 565-66 (App. Div. 1997) (quoting Czachor, supra, 82 N.J. at 398). "Thus, when instructing a jury that reports being deadlocked, a trial judge must be especially vigilant to avoid communicating a results-oriented message that could be perceived as intolerant of dissent and antagonistic to the free expression of strongly held beliefs that may not be

shared by a majority of the deliberating jurors." Dorsainvil, supra, 435 N.J. Super. at 481.

Here, the record is replete with instances showing the trial judge repeatedly communicated to the jury a clear message favoring those jurors who were willing to continue deliberating and characterizing the one juror who expressed a dissenting point of view as an "obstructionist." This judicial bias in favor of unanimity ultimately manifested itself in the judge's taking the extraordinary action of stripping juror number 1 of her role as foreperson under Rule 1:8-4, and bestowing that title and commensurate responsibilities to juror number 2. Although the judge acted to facilitate the jury's deliberations, his decision was legally flawed in a number of ways.

The judge's first legally misguided step was in the manner he selected to respond to the note sent by the group of nine jurors on the second day of deliberations. Rule 1:8-4 does not define the duties of a jury's foreperson. However, the Model Charge for Appointing the Foreperson approved by the Supreme Court on January 14, 2013, provides the definition the trial judge correctly gave here at the time he selected juror number 1 as the foreperson in accordance with Rule 1:8-4:

> Juror # _____ you are the foreperson of
> the jury because of your position in the
> jury box.    You will preside over the
> deliberations and tell us the verdict when

reached. Your vote carries no greater weight than that of any other deliberating juror.

It is your responsibility to lead deliberations. It is also your responsibility to tell us what the verdict is when the jury has reached it. When you come out with your verdict, please resume the seats you now have. We will make certain everyone is here. We will then ask the foreperson to stand to confirm that you have arrived at a verdict.

We will read each charge and will ask the foreperson what the verdict is as to each. The foreperson will answer with the verdict on each charge. We then poll each of the deliberating jurors to confirm his or her agreement with the verdict announced by the foreperson.

[Model Jury Charge (Criminal), "Judge's Instructions for Selecting and Charging Alternates and Appointing Foreperson" (2013).]

This charge gives the foreperson and his or her fellow deliberating jurors a clear definition of the function of the foreperson and the scope of the administrative functions the court expects this person to perform. The first thing the charge mentions is why the court chose this particular individual to serve in this capacity: (1) you are the foreperson of the jury because of your position in the jury box: (2) the charge then makes clear that the foreperson's vote carries no greater weight than that of any other deliberating juror: (3) finally, the charge clearly states the foreperson has just two

basic responsibilities or duties (a) to lead deliberations; and (b) to tell the trial court what the verdict is when the jury has reached it.

The problem here concerned the meaning of "to lead deliberations." The trial judge properly sought guidance from Barber v. ShopRite of Englewood & Assocs., Inc., supra, the only reported decision from this court that addressed this issue directly. The underlying facts in Barber concerned a civil action filed by the plaintiff to recover compensatory damages for injuries she sustained from a fall on the defendant's premises. Barber, supra, 406 N.J. Super. at 38-39. The case was tried before a civil jury that found the defendant negligent and awarded the plaintiff $876,000 in compensatory damages. Id. at 37.

The defendant Shoprite appealed. While the appeal was pending, we granted Shoprite's motion to supplement the trial record to include an article that appeared in the New Jersey Law Journal eight months after the jury had returned its verdict in favor of the plaintiff. Ibid. The article was written by "Robert Martin, who served as juror number one and foreperson during the trial. During voir dire, Martin disclosed that he was a New Jersey State Senator, a full-time professor of law and a practicing lawyer." Ibid. We "remanded the matter to the

trial court to conduct a hearing and take testimony from Martin and the other jurors with respect to Martin's article." Ibid.

In this article, Martin described his impressions of the jury selection process, he bemoaned the inherent inconveniences imposed on those who are compelled to serve; and chastised the insensitivity and incompetence of those entrusted to care for the jurors. Id. at 46. With respect to the deliberations, Martin wrote that despite his best efforts to conceal or underplay his status as a member of the State Legislature, legal professor, and practicing lawyer, the other jurors looked to him for legal guidance.

> Over the course of our deliberation I became increasingly aware that other jurors were relying on me for assistance, especially in dealing with abstract legal concepts and procedural issues. For example, I was asked to clarify what the judge meant by "proximate cause" and its significance in proving a negligence claim. I do think my familiarity with the law proved helpful to fellow jurors; but I remain undecided as to whether it's advisable to have a lawyer serve on a jury--especially as its foreman. I am convinced that in our case my opinions swayed other jurors and were extremely influential in the final outcome.
>
> [Ibid.]

On remand, the trial court followed our directions and conducted an evidentiary hearing in which Martin and other members of the jury testified and confirmed the undue influence

Martin had on the deliberative process. In addressing this outcome, we made the following comments with respect to the role of the foreperson in a jury:

> Martin was designated foreperson of the jury by virtue of being juror number one--not by his positions as state senator, law professor or lawyer. <u>As foreperson, his role was to maintain order in the deliberations, marshal the jurors' votes on the issues presented on the verdict sheet and to render the verdict on behalf of the jurors.</u> Otherwise, the jury foreperson is only one vote of six and his opinions have no greater weight than those of the other jurors. It is <u>not</u> the role of the foreperson to explain legal concepts to the other jurors.
>
> In short, our review of the entire record in this case convinces us that Martin's explanations to the jury had a "tendency" to influence the verdict. That "tendency," coupled with the cumulative trial errors, deprived defendant of a fair trial. Accordingly, we are constrained to reverse . . . .
>
> [<u>Id.</u> at 56 (first emphasis added) (citations omitted).]

Thus, the role of the foreperson we described in <u>Barber</u> was reaffirmed by the description approved by the Supreme Court in the Model Charge. In the course of deliberations, the foreperson should be permitted to carry out these responsibilities while at the same time holding and expressing a point of view that is entirely at odds with those held by the remaining members of the jury. A juror has the right to stand

61

firm on his or her convictions and decline to deliberate any further.

We do not fault the trial court's decision to accept the initial note from the group of nine jurors with the cryptic message "re deliberations." It is the trial judge's duty to investigate any claims that may affect the integrity of the jury's deliberations. See Dorsainvil, supra, 435 N.J. Super. at 487. However, we hold the trial judge erred in deciding to rely on a "spokesperson" to represent the views of the group. Under these circumstances, the judge should have interviewed each juror individually. See State v. Brown, 442 N.J. Super. 154, 183-84 (App. Div. 2015). This approach would have permitted the judge to gauge the extent of the problem in a private setting conducive to promote candor and honesty and less vulnerable to any intimidation or unintended pressures associated with group-thinking.

By relying only on juror number 10's description of juror number 1's alleged improprieties, the trial judge ran the risk of receiving a skewed account of the events that led to the conflict. By engaging in a lengthy sidebar discussion with juror number 10, the judge and counsel excluded the jurors he was appointed to represent and unintentionally vested this juror with the court's imprimatur, elevating his status within the

jury. The prejudice caused by this approach to defendant's right to a fair trial was revealed when the trial judge accepted at face value juror number 10's description of juror number 1's conduct as "obstructionist" and stripped her of her role as foreperson of the jury.

Under these circumstances, the trial judge's reliance on our decision in Rodriquez to strip juror number 1 of her title as foreperson was misplaced. The defendant in Rodriquez was tried before a jury and convicted of "fourth degree aggravated assault (N.J.S.A. 2C:12-1b(4)); third degree terroristic threats N.J.S.A. 2C:12-3); second degree possession of a handgun for an unlawful purpose (N.J.S.A. 2C:39-4a); and fourth degree possession of a weapon (Molotov cocktail) for unlawful purposes N.J.S.A. 2C:39-4(d))." Rodriquez, supra, 254 N.J. Super. at 341. After deliberations, the jury reported it had reached a unanimous verdict on all eleven counts in the indictment. Id. at 347.

The foreperson initially read the verdict sheet in Rodriquez without incident. "After the not guilty response to count nine (possession of a handgun), the prosecutor brought a disruption in the jury box to the attention of the judge." Ibid. Although the trial judge acknowledged the disruption, he

allowed the foreperson to continue to read the verdict until the

end.  Ibid.  The judge then made the following statement:

> I have to make an observation, we heard what
> we heard and we put on the record, but I
> seem, [sic] unless I'm wrong, some shaking
> their heads, I would suggest and I think I
> take it upon myself as a Judge and I think I
> have the authority to do that, that you go
> back and that you look at it, not that you
> look at your verdict because obviously if
> that's your verdict, that's up to you, I'm
> not interfering with that, I want you to
> know that, but apparently there has been
> shaking of heads. I would like you to go
> back and resolve whatever you have to
> resolve concerning that and then come back
> out again and I would ask you to do that,
> please.
>
> [Ibid. (second and third emphasis added).]

The jury returned to the jury room as directed.  When they

returned to the courtroom after a brief recess, the judge

emphasized he "did not mean to intimidate anyone by sending them

back, but that the shaking of some of the jurors' heads

indicated a lack of unanimity."  Ibid.  The foreperson again

began to read the verdict, presumably as reflected in the

verdict sheet.  After the foreperson finished, counsel requested

the jurors be polled.  This immediately revealed that juror

number 8 did not agree with the verdict as reported by the

foreperson.  The trial judge again sent the jury back to the

jury room to confer.  Ibid.

A-3458-13T1

"Shortly thereafter, the judge received a note from the jury asking whether the [foreperson] could be changed." Ibid. Overruling defense counsel's objection, the trial judge allowed the jury to elect a new foreperson. Ibid. The judge then made the following statement to the jury: "I feel that in spite of what the rule says, that there are always exceptions, so long as they're done for the good, and as long as they're done for truth and justice . . ." Id. at 347-48. The jury retired to the jury room one more time to continue deliberations. Id. at 348. After returning from a brief deliberation, the new foreperson read the new verdict finding the defendant guilty "on counts three, four, nine and ten. The final verdict on count eight was changed from guilty to not guilty. The jury was polled and the verdict was unanimous." Ibid. (emphasis added).

Based on these unusual facts, we affirmed the trial judge's decision to allow the jury to elect a new foreperson. We rejected the defendant's argument "that the trial judge's ruling that the jury could elect a new foreperson violated [Rule] 1:8-4 and may have served to coerce the original foreperson into guilty verdicts in violation of his constitutional right to a unanimous verdict by an impartial jury." Id. at 349-50. Although we acknowledged that the plain language in Rule 1:8-4 "does not contemplate the replacement of a juror, it was

certainly within the ambit of the judge's discretion," to take this action. We noted that <u>Rule</u> 1:1-2 "authorizes relaxation of the rules, to appoint a new foreperson <u>where there were obvious difficulties with the member of the jury originally designated</u>." <u>Id.</u> at 350 (emphasis added). We also emphasized that by correcting the obvious mistake in the original two misread verdicts the defendant actually benefited from one less conviction. <u>Ibid.</u> "Hence, <u>we perceive[d] no coercive influence on the original foreperson or on any juror by either the designation of a new foreperson or the additional deliberations</u>." <u>Ibid.</u> (emphasis added).

The circumstances the trial judge faced in <u>Rodriguez</u> stand in sharp contrast to what occurred in this case. Here, on the second day of deliberations, the jury reported it had reached "an impasse" based on eleven jurors wanting to continue deliberating and one juror that did not. The trial judge's decision to remove juror number 1 from the position of foreperson was a direct response to his assumption that she was the juror who was unwilling to continue deliberating. The record reflects the judge characterized juror number 1 as an "obstructionist" based only on juror number 10's revelations. The decision to remove juror number 1 of her role as foreperson was thus capable of being perceived as retaliatory and intended

to coerce her into changing her stance against reaching a unanimous verdict. This is precisely the type of coercive action the Supreme Court declared unacceptable in <u>Fiqueroa</u>.

In <u>State v. Musa</u>, 222 <u>N.J.</u> 554, 566 (2015), our Supreme Court declared that "the removal of a juror because he is disputatious and does not share the views of other jurors would undermine the very essence of the free and open debate that is expected of jury deliberations." Here, the judge's decision to strip juror number 1 of her role as foreperson merely because of her perceived stance on deliberations, had the same potential chilling effect on her right to disagree with the views espoused by the other eleven jurors.

Under <u>Rule</u> 1:8-2(a), "a deliberating jury in a criminal action shall consist of 12 persons," unless otherwise stipulated by the parties at any time before the jury returned the verdict. Pursuant to <u>Rule</u> 1:8-9, "In every trial by jury the verdict shall be returned by the jury to the judge in open court. The verdict shall be unanimous in all criminal actions [.]" Thirty-six years ago, our Supreme Court decided in <u>Czachor</u> to abandon the then prevailing <u>Allen</u>[10] charge in favor of the model charge suggested by the American Bar Association. The principal

_____

[10] <u>Allen v. United States</u>, 164 <u>U.S.</u> 492, 17 <u>S. Ct.</u> 154, 41 <u>L. Ed.</u> 528 (1896).

concern that drove the Court's decision in Czachor was the intolerance of dissent expressed in the Allen charge.

> It is fair to say that the typical Allen charge does not simply remind jurors of their duty to cooperate in collective deliberations. It has a rather different thrust. The charge is intended to undo a jury deadlock. It tends therefore to focus upon possibly the weakest links in the chain locking the jury in disagreement, namely, the minority holdouts on the jury. Hence, the charge usually admonishes specifically and pointedly only those in the minority to reconsider their beliefs in light of the adverse position held by the majority.
>
> . . . .
>
> An instruction that explicitly directs only the dissenters to doubt the reasonableness of their convictions is inherently one-sided.
>
> [Czachor, supra, 82 N.J. at 398-99 (emphasis added).]

Dissent against unanimity, with all its commensurate inconvenience, is a constitutionally protected position for a juror to take in the course of deliberations. It is a position a defendant is entitled to rely on and one the court is obligated to protect as ancillary to the State's obligation to prove defendant's guilt beyond a reasonable doubt to a unanimous jury. As noted by Justice Albin in Musa: "Although jurors are urged to attempt to reach consensus, discord, not just assent, is a natural part of the deliberative process. A court may not

play any role in jiggering a jury panel's composition for the purpose of imposing conformity." Musa, supra, 222 N.J. at 566. Here, the trial judge's well-intended preoccupation with promoting unanimity undermined defendant's right to a fair trial and overwhelmed the jury's autonomous role as the judges of the facts.

Finally, we are compelled to comment on the judge's decision to agree to meet with the group of nine jurors. Confronted with allegations of impropriety in the deliberative process, the judge should have interviewed each juror separately and

> in the presence of counsel, to determine if there is a taint; if so, the inquiry must expand to determine whether any other jurors have been tainted thereby. The trial court must then determine whether the trial may proceed after excusing the tainted juror or jurors, or whether a mistrial is necessary.
>
> [State v. R.D., 169 N.J. 551, 558 (2001) (citations omitted).]

Here, the judge's undue reliance on juror number 10's version of events left a number of important issues unaddressed. Key among them is the judge's failure to interview the two jurors who chose not to join the group of nine's criticism of the way juror number 1 was discharging her responsibilities as foreperson. Interviewing these two jurors separately could have given the

judge a valuable insight independent of the views heard from juror number 10.

It is well known that jury deliberations can be boisterous and contentious. However, as the Court noted in <u>Figueroa</u> and recently reaffirmed in <u>Ross</u>, a trial judge's interactions with the jury must be "guided by a concern for the weighty role that the judge plays in the dynamics of the courtroom." <u>State v. Ross</u>, 218 <u>N.J.</u> 130, 145 (2014) (quoting <u>Figueroa</u>, <u>supra</u>, 190 <u>N.J.</u> at 238). Unlike interviewing an individual juror in response to a personal matter or concern, a judge's decision to meet with a group of jurors in response to how deliberations are being conducted may thrust the judge in the midst of an internal debate over which the judge cannot be viewed as a partisan.

As this case illustrates, any attempt by the judge to mediate the dispute or ameliorate the hostility only sucks the court deeper into the vortex. The deliberative process is designed to be confidential to promote the free exchange of ideas and points of view. <u>Musa</u>, <u>supra</u>, 222 <u>N.J.</u> at 568. Other than charging the jury with the supplemental instructions approved by the Supreme Court in <u>Czachor</u> which, <u>inter</u> <u>alia</u>, exhorts each juror "not [to] surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of

returning a verdict," a trial judge has no role to play in facilitating the jury's discussions or promoting unanimity. Czachor, supra, 82 N.J. at 405 n.4 (quoting ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury, § 5.4 cmt., at 146-47 (Approved Draft 1968)). Unfortunately, the record we have taken the time to recite at length shows the trial judge asking jurors on more than one occasion to "tell me what you think I should need to know to try to move this towards a verdict."

The decision to grant a mistrial rests within the sound discretion of the trial judge. R.D., supra, 169 N.J. at 558. We are satisfied the record here shows the trial judge erred in the exercise of this discretion when he denied defendant's applications for a mistrial. Because this issue is sufficient to warrant the reversal of defendant's conviction, we do not reach the remaining arguments raised by defendant in this appeal.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION