# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1330-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ALDOPHUS MIMS,

    Defendant-Appellant.

_____

Argued November 17, 2021 – Decided August 26, 2022

Before Judges Gilson, Gooden Brown, and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 16-09-0797.

Adam W. Toraya argued the cause for appellant.

Tiffany M. Russo, Assistant Prosecutor, argued the cause for respondent (Robert J. Carroll, Morris County Prosecutor, attorney; Tiffany M. Russo, on the brief).

PER CURIAM

Following a jury trial, defendant was convicted of multiple counts of first-degree human trafficking, first-degree promoting child prostitution, second-degree sexual assault, third-degree child endangerment, and third-degree distribution of controlled dangerous substances (CDS). He was sentenced to an aggregate term of forty years' imprisonment, with a forty-year period of parole ineligibility, comprised of two consecutive sentences.

The convictions stemmed from defendant plying a fifteen-year-old and a seventeen-year-old girl with illicit drugs and alcohol, arranging for them to engage in prostitution with several men in hotel rooms over the course of a week, and engaging in sex acts with at least one of the minors. A codefendant, Debbie Kooken, solicited the customers by posting "half-naked" pictures of the girls online. Once law enforcement became aware of the criminal conduct, an investigation commenced that included consensual telephonic interceptions of incriminating conversations between defendant and one of the victims and between defendant and codefendant Kooken. After defendant was arrested, he was given Miranda[1] warnings and advised that law enforcement was looking into allegations of forced prostitution. Although defendant waived his rights and gave an incriminating statement that was admitted at trial, during the trial,

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

he claimed his prior admissions pertained to different women. Defendant also sought to present a defense of third-party guilt by introducing purportedly exculpatory evidence from an unrelated case involving a former police officer, Wilfredo Guzman. Guzman had been convicted of sex acts involving the same two victims. However, defendant's motion for discovery in the Guzman case was denied by the trial court and his subpoena to obtain Guzman's testimony at his trial was quashed.

On appeal, defendant raises the following points for our consideration:

> POINT I
>
> THE TRIAL COURT IMPROPERLY DENIED DEFENDANT'S REPEATED REQUESTS FOR A MISTRIAL AFTER A CONFLICT ERUPTED AMONG THE JURORS AND AT LEAST ONE JUROR WANTED TO STOP DELIBERATING BECAUSE OF THE BULLYING SHE WAS FACING.
>
> POINT II
>
> THE COURT ERRED IN FAILING TO SUPPRESS . . . DEFENDANT'S STATEMENT ON THE BASIS THAT IT WAS INVOLUNTARY BECAUSE DEFENDANT WAS NEVER TOLD THE TRUE STATUS BEFORE BEING ASKED TO WAIVE HIS MIRANDA RIGHTS.
>
> POINT III

3

THE COURT ERRED IN FAILING TO GRANT DEFENDANT'S REQUEST FOR A CLAWANS[2] CHARGE AFTER THE STATE FAILED TO CALL . . . KOOKEN AS A WITNESS.

POINT IV

THE COURT ERRED IN DENYING DEFENDANT'S REQUEST FOR FURTHER DISCOVERY OF EXCULPATORY EVIDENCE REGARDING THE GUZMAN CASE.

POINT V

THE SENTENCE IMPOSED WAS EXCESSIVE.

Having reviewed the record in light of the applicable legal principles, we affirm.

## I.

We glean these facts from the eight-day jury trial conducted in May and June of 2019, during which the State produced eight witnesses, including both victims. Defendant testified on his own behalf.

Rockaway Borough Police Officer Scott Haigh was the School Resource Officer at Morris Hills High School in June 2015.[3] He testified that on June 18, 2015, he saw a missing persons poster at police headquarters for a fifteen-

---

[2] State v. Clawans, 38 N.J. 162 (1962).

[3] Haigh has since retired.

A-1330-19

year-old girl, later determined to be K.M, who was born in July 1999. By talking to several individuals at the school, Haigh located the cellphone number for K.M.'s friend, S.B., who was born in July 1997 and was then seventeen-years-old. Haigh called S.B. and inquired about K.M.'s whereabouts and safety. After some initial reluctance, S.B. eventually told Haigh that they were both with a thirty-eight-year-old man they knew as "Al" at the Red Roof Inn in Charlotte, North Carolina, and wanted to return home to New Jersey. Al was later identified as defendant.

Haigh contacted North Carolina law enforcement officers, who went to the hotel and brought the girls back to police headquarters in Charlotte to await the arrival of their families and ultimate return to New Jersey. On June 23, 2015, after the girls returned to New Jersey, Haigh met with S.B. at his office at Morris Hills High School, where she described how she and K.M. had met defendant and had been performing sex acts for money in Rockaway Township. Haigh then accompanied S.B. to the Rockaway Township Police Department,[4] where she gave a detailed statement about her involvement with defendant.

---

[4] Rockaway Borough Police Department and Rockaway Township Police Department are two separate police departments.

A-1330-19

At trial, S.B. testified that in June 2015, she had "a pretty toxic relationship" with her parents. She met K.M. at a party, and the two became "best friends" and would "hang out" together. Around June 10, 2015, the girls met defendant at the Rockaway Hotel. S.B. stated she and K.M. were at the hotel "hanging out with some friends" when defendant told them that "he had a room . . . for the rest of the week and that [they] should come by." S.B. testified she exchanged numbers with defendant and spoke on the phone with him the following day. She told him she and K.M. were planning to go to Newark to have sex for money to fund their drug habit. Defendant told her to come to the Rockaway Hotel instead because "he had a way to take care of it, and he could make [them] money." Defendant explained "he knew someone that could help," which S.B. interpreted to mean they would be going to the hotel "[t]o have sex for money."

After having a few drinks with defendant in his hotel room, defendant told the girls they had to call codefendant Kooken to make the arrangements and provided her number. S.B. called Kooken that night and Kooken told her and K.M. to send her "half-naked pictures" of themselves for her to post online for customers. After they sent the pictures, customers started coming to the Rockaway Hotel that same night. Kooken would text S.B. and tell her the

6

name of the customer, what they were coming for, and how much money to collect. Corroborating text messages between S.B. and Kooken, beginning on June 14, 2015, were admitted into evidence. Defendant instructed the girls to get the money before anything happened and to place the money in the drawer of the side dresser table. Defendant usually waited in his car downstairs and would come back into the room to collect the money after the customer left. Neither S.B. nor K.M. ever received any of the money and were too "scared" to take any of the money.[5]

S.B. testified that, between the two of them, she and K.M. met with ten to twenty customers the first night, engaging in both oral and vaginal sex. S.B. said most times, they were in the room together "because it was scary." S.B. believed they remained at the Rockaway Hotel for "one or two" days. The second night was the same as the first, with both S.B. and K.M. meeting with about ten to twenty customers in total. After they left the Rockaway Hotel, the girls went with defendant to the Red Roof Inn in Parsippany and performed the same type of sex acts for money for about ten to twenty customers total.

S.B. testified that during their time with defendant, she and K.M. used "alcohol," "some cocaine," and "a lot of heroin." S.B. said they did "four to

---

[5] The girls recounted one instance when the customer paid more than the prearranged price and they kept the difference.

five bags" of heroin "at a time, multiple times a day," all supplied by defendant. S.B. maintained that she never had sex with defendant, but K.M. did. According to S.B., they barely ate or slept and mainly worked "[a]fter midnight." During the daytime, they did "drugs" and "got ready" for the customers. S.B. only left the hotel "to go do [her] laundry" and to attend her "[high school] graduation," accompanied by K.M. Both times, defendant drove them to their location and then brought them back to the hotel. Defendant also took the girls shopping at "[t]he Rockaway Mall" for "[h]eels and short skirts and crop tops" to take more photos for Kooken to post online. S.B. stated her only contact with Kooken was by telephone.

S.B. estimated the girls worked for defendant at the hotels in New Jersey for "close to a week" in total before defendant drove them down to the hotel in North Carolina. S.B. believed they were in North Carolina for "maybe just one [night]" before Haigh contacted her. She stated that, eventually, neither she nor K.M. wanted to continue, but they did not stop because they "were scared, especially once [they] got down to North Carolina." After she returned to New Jersey, S.B. agreed to cooperate with the detectives who had obtained authorization for a consensual telephonic interception. As a result, on June 23, 2015, S.B. made three taped phone calls to defendant to discuss what had

8

occurred between him and the girls. In these calls, which were played for the jury, S.B. asked defendant about getting another hotel room for them to "work" out of, which defendant said was "fine" with him. When S.B. suggested to defendant that they should eliminate Kooken by posting the "ad[s] by [them]selves," defendant replied, "[t]hat's fine."

K.M.'s testimony was largely consistent with S.B.'s. K.M. testified she "was . . . shock[ed]" when defendant first told them they would be selling themselves for money. However, K.M. confirmed they never received any of the proceeds and were too scared to question defendant. K.M. also confirmed they were "never" sober while they were with defendant or while they were performing sex acts. She acknowledged that defendant supplied them with all the illicit narcotics and alcohol they ingested. K.M. further admitted having sex with defendant in the Rockaway Hotel and in his car while S.B. was with a customer, and, despite S.B.'s denial, K.M. testified defendant made both her and S.B. perform oral sex on him in the Rockaway Hotel room. K.M. also testified defendant "forcefully had sex with [her]" when she was trying to sleep at the Rockaway Hotel.

On June 25, 2015, defendant was arrested in New Jersey after being pulled over by an unmarked police car and transported to the Rockaway

A-1330-19

Township Police Department. At headquarters, defendant was interviewed by Morris County Prosecutor's Office Sergeant Marshall Wang and Rockaway Township Police Detective Tom Takacs. Wang testified at the trial, and the recorded interview was played for the jury in its entirety. After telling defendant he was looking into allegations of "forced prostitution" and that defendant was "involved in the investigation," Wang read defendant his Miranda rights, which defendant waived, saying "of course" he would talk to them.

In his statement, defendant recalled meeting S.B. and K.M. and putting them in contact with Kooken but maintained he was only involved to "have fun" with the girls, and any prostitution taking place was arranged between the girls and Kooken. Nonetheless, defendant admitted having sexual intercourse with K.M. in the Rockaway Hotel and admitted receiving oral sex from K.M. Defendant also admitted selling heroin to the girls. Defendant's statement also corroborated certain aspects of the girls' version of events, including: the way in which they met; the introduction to Kooken; defendant's retrieval of funds from the hotel room and delivery to Kooken; the two different hotels in New Jersey; defendant taking them shopping; and the trip to North Carolina.

10

Additionally, a record of 112 telephone calls between defendant and S.B. from June 14 to June 23, 2015, was recovered from S.B.'s phone's call history.

Kooken was also arrested and gave an incriminating statement to police inculpating defendant. At the behest of law enforcement, which had obtained authorization for a consensual telephonic interception, Kooken called defendant and talked about the girls' accusations. During the conversation, defendant denied the accusation that he "kept all of the money all of the time," insisting instead that he paid Kooken, bought the girls' clothes, and "let them get high." The taped conversation was played for the jury. The State also produced 302 text messages "with . . . prostitution talk" between Kooken and S.B. beginning on June 14 and ending on June 22, 2015. The text messages were admitted into evidence. Kooken subsequently agreed to plead guilty to two counts of promoting prostitution, one count pertaining to each victim. In exchange for full and complete cooperation, the State would recommend an aggregate seven-year sentence of imprisonment. Nonetheless, Kooken did not testify at defendant's trial.

Defendant testified on his own behalf and stated that S.B. and K.M. initially approached him to buy drugs and he exchanged numbers with them to do "further business." He admitted meeting up with them later. However,

11

when shown photographs of the girls at trial, defendant denied knowing S.B. or K.M., claiming instead that he knew "different women" and that he went to North Carolina with "different women" because they wanted to have "fun" and "wanted to be around [him]." Defendant denied admitting he had sex with K.M. in his statement to police, claiming he had sex with a woman with the same first name. Defendant also testified he had no knowledge of S.B. and K.M. engaging in any prostitution and denied knowing Kooken.

Defendant was charged in a thirty-one count indictment with eight counts of first-degree human trafficking, N.J.S.A. 2C:13-8(a) (counts one through eight); four counts of first-degree promoting child prostitution, N.J.S.A. 2C:34-1(b)(3) (counts nine through twelve); two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(4) (counts thirteen and fourteen); five counts of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (counts fifteen through nineteen); four counts of second-degree conspiracy to commit human trafficking, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:13-8(a)(3) (counts twenty through twenty-three); four counts of second-degree conspiracy to promote child prostitution, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:34-1(b)(3) (counts twenty-four through twenty-seven); and four counts of third-

degree distribution of CDS, N.J.S.A. 2C:35-5(a)(1) and N.J.S.A. 2C:35-5(b)(3) (counts twenty-eight through thirty-one).

Following the trial, defendant was convicted of four counts of first-degree human trafficking (counts one, two, five, and six); three counts of first-degree promoting child prostitution (counts nine, eleven and twelve); two counts of second-degree sexual assault (counts thirteen and fourteen); three counts of third-degree endangering the welfare of a child (counts sixteen, eighteen, and nineteen); and two counts of third-degree distribution of CDS (counts twenty-eight and twenty-nine).

The jury acquitted defendant of counts three, four, seven, eight, thirty, and thirty-one, and was hung on the remaining eleven counts, which were subsequently dismissed on the State's motion. After appropriate mergers, defendant was sentenced to twenty years' imprisonment, with a twenty-year-period of parole ineligibility, each on counts one and two, to run consecutive to each other; concurrent fifteen-year terms each on counts five and six; concurrent ten-year terms each on counts thirteen, fourteen, twenty-eight, and twenty-nine; and concurrent five-year terms each on counts sixteen and eighteen. Defendant was also sentenced to a special sentence of parole supervision for life, N.J.S.A. 2C:43-6.4, and restrictions under Megan's Law,

N.J.S.A. 2C:7-1 to - 23, on counts thirteen and fourteen, and received an extended term pursuant to N.J.S.A. 2C:43-6(f) on counts twenty-eight and twenty-nine. A memorializing judgment of conviction was entered on September 24, 2019, and this appeal followed.

## II.

In Point I, defendant argues the trial judge "erred in failing to grant [d]efendant's multiple requests for a mistrial" in light of "the numerous disputes between the deliberating jurors," which included "verbal attacks and emotional injuries," resulting "in a verdict that was tainted by a coercive and chaotic environment."

"The decision to grant or deny a mistrial is entrusted to the sound discretion of the trial court" and will not be disturbed on appeal "absent an abuse of discretion that results in a manifest injustice." State v. Harvey, 151 N.J. 117, 205 (1997). "Declaring a mistrial imposes enormous costs on our judicial system, from the expenditure of precious resources in a retrial to the continued disruption in the lives of witnesses and parties seeking closure." State v. Musa, 222 N.J. 554, 565 (2015) (quoting State v. Jenkins, 182 N.J. 112, 124 (2004)). For that reason, "[t]he grant of a mistrial is an extraordinary remedy to be exercised only when necessary 'to prevent an obvious failure of

14

justice,'" and "an appellate court should not reverse a trial court's denial of a mistrial motion absent a 'clear showing' that 'the defendant suffered actual harm' or that the court otherwise 'abused its discretion.'" State v. Yough, 208 N.J. 385, 397 (2011) (first quoting Harvey, 151 N.J. at 205; and then quoting State v. Labrutto, 114 N.J. 187, 207 (1989)).

"To address a motion for a mistrial, trial courts must consider the unique circumstances of the case" and consider "[i]f there is 'an appropriate alternative course of action,'" such as giving "a curative instruction . . . or some other remedy, . . . depending on the facts of the case." State v. Smith, 224 N.J. 36, 47 (2016) (quoting State v. Allah, 170 N.J. 269, 280-81 (2002)). If the trial court elects to remove and substitute a deliberating juror pursuant to Rule 1:8-2, rather than declare a mistrial, we also afford deference to that decision and will not disturb it absent an abuse of discretion. Musa, 222 N.J. at 564-65. Nonetheless, our Supreme Court has cautioned that "juror substitution 'should be invoked only as a last resort'" because "juror substitution poses a clear potential for prejudicing the integrity of the jury's deliberative process." Jenkins, 182 N.J. at 126 (quoting State v. Hightower, 146 N.J. 239, 254 (1996)). Thus, "[t]he court must be prepared to declare a

mistrial if a substitution would imperil the integrity of the jury's process." State v. Ross, 218 N.J. 130, 147 (2014).

"A criminal defendant's 'constitutional right to be fairly tried by an impartial jury' is protected by both the Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution." State v. Dangcil, 248 N.J. 114, 140 (2021) (quoting State v. Little, 246 N.J. 402, 414 (2021)). A jury's verdict must be "based solely on [the] legal evidence produced before it and entirely free from the taint of extraneous considerations and influences." Panko v. Flintkote Co., 7 N.J. 55, 61 (1951). "It is well settled that the test for determining whether a new trial will be granted because of the misconduct of jurors or the intrusion of irregular influences" is "not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so." Ibid.; see also Hightower, 146 N.J. at 266-67 ("Any juror misconduct or improper intrusion into the deliberations of a jury that 'could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge' is a ground for a mistrial." (quoting Panko, 7 N.J. at 61)). Yet, as the United States Supreme Court has noted, due process does not require the trial court to "shield jurors from every contact or influence that might

16

theoretically affect their vote."  Smith v. Phillips, 455 U.S. 209, 217 (1982).  Indeed, "a trial is not a perfectly scripted . . . presentation; rather, it is an extemporaneous production whose course is often unpredictable, given the vagaries of the human condition."  Yough, 208 N.J. at 397.

Rule 1:8-2(d)(1) provides that a trial court may not substitute an alternate juror unless "a juror dies or is discharged by the court because of illness or other inability to continue."  Generally, our courts "have restrictively interpreted the phrase 'inability to continue' . . . to protect a defendant's right to a fair jury trial, forbidding juror substitution when a deliberating juror's removal is in any way related to the deliberative process."  Jenkins, 182 N.J. at 124; see also Ross, 218 N.J. at 147.  Thus, "[a] deliberating juror may not be discharged and replaced with an alternate unless the record 'adequately establish[es] that the juror suffers from an inability to function that is personal and unrelated to the juror's interaction with the other jury members.'"  Jenkins, 182 N.J. at 124-25 (second alteration in original) (quoting Hightower, 146 N.J. at 254).

"We recognize that the essence of jury deliberations is the joint or collective exchange of views among individual jurors."  State v. Corsaro, 107 N.J. 339, 349 (1987).  "A juror has the unassailable right to see the evidence in

[his or] her own way and to reach [his or] her own conclusions, regardless of how overwhelming the evidence or how illogical [his or] her view may appear to other jurors." Jenkins, 182 N.J. at 125. "If a court suspects that the problems with the juror are due to interactions with other jurors, the court should instruct the jury to resume deliberations." Ibid. (quoting Hightower, 146 N.J. at 254); see also State v. Valenzuela, 136 N.J. 458, 472-73 (1994) (concluding the trial court committed reversible error by discharging a juror who assured the court she could follow the instructions but stated she was unable to continue because other jurors were "ganging up" on her, "discounting" her opinions, and considered her an obstacle to a verdict); State v. Miller, 76 N.J. 392, 401, 406-07 (1978) (upholding removal of deliberating juror who asked to be dismissed because his nervous and emotional condition was "affecting his judgment" and "he did not think he could render a fair verdict"); State v. Paige, 256 N.J. Super. 362, 380-81 (App. Div. 1992) (holding that trial court cannot discharge juror merely because juror is at odds with rest of jury); State v. Trent, 157 N.J. Super. 231, 235, 240 (App. Div. 1978) (allowing removal of deliberating juror who was "nervous," "too emotional," and suffering from a "headache" and nausea because defendant reminded her of her son), rev'd on other grounds, 79 N.J. 251 (1979).

18

On the other hand, "[a] physical altercation between two or more deliberating jurors constitutes an irreparable breakdown in the civility and decorum expected to dominate the deliberative process" and "[a] jury verdict tainted by such an inherently coercive and chaotic environment . . . cannot stand as a matter of law." State v. Dorsainvil, 435 N.J. Super. 449, 482 (App. Div. 2014). Thus, in Dorsainvil, we reversed and remanded for a new trial where "one juror had threatened to commit physical harm against a fellow juror, and another juror may have actually physically assaulted a fellow juror, all in the course of deliberations." Id. at 484.

To be sure, "[t]he trial court is charged with maintaining 'an environment that fosters and preserves ["the joint or collective exchange of views among individual jurors"] until the jury reaches a final determination.'" Ross, 218 N.J. at 147 (quoting State v. Williams, 171 N.J. 151, 163 (2002)). To that end, "[i]t is the trial judge's duty to investigate any claims that may affect the integrity of the jury's deliberations." State v. Gleaton, 446 N.J. Super. 478, 518 (App. Div. 2016).

Here, members of the deliberating jury submitted several notes to the judge throughout the course of deliberations. Defendant's argument focuses on specified notes and comments made by three jurors. On June 6, 2019, the

19

second day of deliberations, there was a note from the jury which read: "The woman on the floor making the chart said she'd vote so it'd be a mistrial if it's not wrapped up today." After reviewing the note with counsel, the judge stated it was "simply juror conversation" and the court had "no reason to interfere with or comment upon such conversation." Thus, the judge determined he would "do nothing with respect to that note." Defense counsel had no objection.

On June 10, 2019, the third day of deliberations, the judge excused juror eight because the juror was hospitalized, and, over defense counsel's objection, substituted an alternate juror.[6] After the newly constituted jury received instructions from the judge, deliberations commenced anew. Following the reconstitution of the jury, juror five sent out a note to the judge stating: "I can't do this anymore. I'm emotionally stressed. I feel like I'm going to have an anxiety attack if I continue. I can't do this and I want to be taken out immediately for my own mental health." When the judge questioned juror five on the record, the juror indicated she would "stay" and "finish" and confirmed that she could review the testimony and the law as instructed by the court. The

---

[6] Defendant does not challenge the substitution on appeal.

A-1330-19

judge concluded that based on the juror's responses, he "[would] not excuse her from jury deliberations." Defense counsel did not object.

The judge received another note from an unidentified juror stating: "[I]f one juror is refusing to discuss anything beyond guilty/not guilty and not based on law, what do we do?"[7] Based on that note, defense counsel moved for a mistrial, arguing "it appear[ed] that there [was] a deadlock." The judge disagreed and denied the motion, stating "the jury ha[d] not indicated a deadlock" and had, in fact, requested playback of testimony. The judge also determined that he would not address the note with the jury.

Before the judge excused the jury for the day, juror five again indicated to the judge she could not continue as a juror. After discussing the issue with the attorneys, the judge conducted the following voir dire with juror five:

> [COURT]: Now, are you telling me that you're unable to continue because of some personal feelings you have about the case?
>
> [JUROR FIVE]: No, not personal feelings.
>
> [COURT]: Why?
>
> [JUROR FIVE]: . . . I just feel just like I'm being cornered in that room. And it's like I'm being attacked. And it's like if I sit there and not say

---

[7] A similar note is identified as C-13 in the record but was never addressed by the judge.

A-1330-19

anything and just do the vote, it's not good enough. Meanwhile, there's other people that don't murmur a peep and it's just always me and they're like, "not to throw you under the bus," or "not to attack you," and it's just, it's too much. It's like damned if I do, damned if I don't.

[COURT]: Okay. Now, you understand . . . that it's the function of the juror, all twelve people in the room, to talk about the case, talk about the facts they have heard, and apply the facts to the law as I give to the jury. Now, are you telling me you can't do that?

[JUROR FIVE]: I could do that, and I tried doing that.

[COURT]: All right. Thank you. Please step back in the room.

Based on the voir dire, the judge found no basis to remove juror five under Rule 1:8-2. Defense counsel moved for a mistrial, arguing that his client was prejudiced by the fact that juror five was "getting bullied in th[e] jury room." The judge denied the motion. After the judge again confirmed with juror five that she could "find facts based upon the testimony and apply those facts to the law" as instructed by the court, the judge told juror five that she would continue to deliberate and excused the jury for the day.

The following day, June 11, 2019, the judge received a note from juror one stating, "As the spokesperson in review, I would like to have a sidebar with [the judge]. I have not mentioned this note to the jurors." Before

22

questioning juror one, the judge cautioned the juror that he could not discuss the juror's view of the evidence or the status of jury deliberations. See Jenkins, 182 N.J. at 134 (cautioning judges that "[a] careful inquiry by a court may forestall the inadvertent disclosure of confidential information by a juror" that "could damage the deliberative process"). With that caveat, juror one told the judge she felt there was "no respect for . . . people's opinions" and "there [was] some bias." At that point, the judge instructed juror one to return to the jury room but later recalled juror one to clarify her earlier comment that "there was some bias" in the jury room. Juror one clarified that she was not referring to any racial bias but explained that there were two different jury factions with "a few people always voting one way and the rest voting another" and "the few people" with opposing votes were being "really scrutinized."

Defense counsel renewed his motion for a mistrial, arguing that based on juror one's and juror five's comments, "the [j]ury [was] not functioning properly." The judge reserved on the mistrial application and continued with the playback of testimony that had previously been requested by the jury. Before the judge ruled on the mistrial application, he received a note from juror number two and conducted the following voir dire on the record with the juror:

[COURT]:  Hi.  You –

[JUROR TWO]:  Hi.

[COURT]:  -- can sit down.

[JUROR TWO]:  Judge, I'm done.

[COURT]:  I'm –

[JUROR TWO]:  I'm done.  I don't want to do this anymore.

[COURT]:  Okay, now, relax for a minute.

[JUROR TWO]:  Don't make me cry.

[COURT]:  I don't want to make you cry.

[JUROR TWO]:  Let me go.

[COURT]:  Just a minute, okay.  Now, I know this is very stressful, okay.  I'm certain that's the case, but you know and I know that this case has got to come to a conclusion.  And you know and I know that it's necessary for fair and impartial jurors to decide that issue.  And what you're telling me, I take it . . . is that the pressure of what's going on -- sure, do you want some water or a tissue?

[JUROR TWO]:  Thank you.

[COURT]:  I take it the pressure of what's going on is what's bothering you from what you say; is that right?

[JUROR TWO]:  I'm sorry?

[COURT]:  Is it the pressure of what's going on?

24

[JUROR TWO]: It's the attitude, the pressure. I'm just sick of it.

[COURT]: What do you mean? Can you just give me more of a description?

[JUROR TWO]: You know, obviously we're voting. If you don't agree, --

[COURT]: I don't know what you're doing and don't tell me --

[JUROR TWO]: I won't -- I won't --

[COURT]: -- what the deliberations are --

[JUROR TWO]: -- I won't tell you what --

[COURT]: -- or what the vote is.

[JUROR TWO]: -- if you don't agree and you ask a question, you have people laughing, smirking, rolling their eyes, like pfft, oh, for -- you know, it's like -- you don't -- you would have no idea what is going on. Yesterday morning, I'll tell you, I -- I had a whole list for you that I was going to come in this morning. I said let me give it one more day. Yesterday morning . . . I drink a coffee. . . . [I]t went down the wrong way. I'm choking. The guy next to me, oh, well, if you had choked to death, we could have got an alternate in here and then we'd be in better shape. Come on.

[COURT]: All right, all right, now, you --

[JUROR TWO]: This is not right.

25

[COURT]: -- understand that there's a lot of pressure and people act differently with regard to pressure.

[JUROR TWO]: I'm usually very good with it.

[COURT]: Okay, and some people aren't as good as you are and may react in a way which appears to be strange or unacceptable. Here's what we're going to do. First of all, I'm going to send you to lunch, okay. Then I'm going to have you think about it a little bit, okay. And then come back and try your best to continue in the jury room, okay. That's the best I can do right now, okay. So let me get the rest of the [j]ury in here and I'll excuse you for lunch and that way you have a break, think about it a little more.

Before releasing the jury for lunch, the judge gave the following instruction:

I'm sending you to lunch, okay. Upon your return, you're to return to the jury room and I want to make sure that, you know, everybody understands, I understand the pressure of being a juror, okay. It's not easy and it shouldn't be easy really because . . . there are a lot of things at stake. So . . . it's your duty to . . . have listened to the testimony, to deliberate to come to a verdict if you're able to do so, and to treat each other with the respect and dignity that each of you deserves, okay.

Defense counsel raised his mistrial application once again. He explained that he had further concerns given juror two's comments indicating that the jurors were "not deliberating" but "simply fighting with each other." After the lunch recess, the judge gave the jury the supplemental instructions approved

26

by the Supreme Court in <u>State v. Czachor</u>, 82 N.J. 392 (1980) (the <u>Czachor</u> charge). <u>See</u> <u>Model Jury Charges (Criminal)</u>, "Judge's Instructions on Further Jury Deliberations" (approved Jan. 14, 2013). The judge instructed the jury as follows:

> Members of the [j]ury, I know you have been considering this case for some time and you've had considerable time of readback, as well as other activities brought back to you from the trial itself.
>
> Let me just charge you this. It's your duty as jurors to consult with one another and to deliberate with the view toward reaching an agreement if you can do so without violence to your individual judgement. Each of you must decide this case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if you are convinced it's erroneous, but do not surrender your honest conviction as to the weight of evidence solely because of the opinion of your fellow jurors or for the mere purpose of rendering a verdict.
>
> You're not partisans. You're judges. Judges of the facts. It's up to you to weigh the testimony that you've heard, to consider the credibility of the witnesses, and other factors which lead you to believe that you can render a -- fair verdict with regard to whether this defendant is proved to be guilty beyond a reasonable doubt. That is the function of the [j]ury. That's you[r] job. You're judges of the facts. And based upon that, you must apply the law as I instruct it to you. Not what you think the law ought to be if it

27

conflicts. You must follow the law which I gave to you.

All right, I'm going to ask you to return to the jury room for . . . just a moment and we'll see whether or not I need to consult with you further. . . . If not, simply continue your deliberations.

Defense counsel did not object to the charge. Shortly thereafter, the judge denied defendant's motion for a mistrial.

The next day, June 12, 2019, the judge received a note indicating that the jury had reached a partial verdict and was deadlocked on several counts. Following the lunch recess, the judge accepted the partial verdict and excused the jury. Defendant did not object. See State v. Shomo, 129 N.J. 248, 257 (1992) ("[T]rial courts possess the discretion to accept [partial] verdicts absent a showing of prejudice to the defendant."). The counts on which the jury was deadlocked were subsequently dismissed on the State's motion. Other than the note regarding the partial verdict, the judge received no other notes from the jury after giving the model charge on further jury deliberations.

The record, which we have taken the time to recite at length, clearly establishes that jury deliberation was stressful, and several jurors felt distressed and overwhelmed at times. Vitriolic comments by some jurors further exacerbated an already tense environment. However, the issues raised

by the complaining jurors arose exclusively from the interactions with other jurors during deliberations, rather than personal issues rendering them unable to continue.  See Jenkins, 182 N.J. at 125; Valenzuela, 136 N.J. at 472-73.  Removal of jurors "for reasons relating to the interchange between jurors or the deliberative process," rather than "for reasons personal to the juror" is strictly prohibited.  Musa, 222 N.J. at 567.

"It is well known that jury deliberations can be boisterous and contentious."  Gleaton, 446 N.J. Super. at 523.  "[D]iscord, not just assent, is a natural part of the deliberative process."  Musa, 222 N.J. at 566.  "'It is to be expected that in the interplay of personalities attending a jury's deliberations there will be occasions when some jurors will give vent to feelings of exasperation or frustration.'"  State v. Young, 181 N.J. Super. 463, 470 (App. Div. 1981) (quoting State v. Athorn, 46 N.J. 247, 253 (1966)).  Generally speaking, however, "jury verdicts shall not be disturbed because of what may have been said by jurors during their deliberations."  Athorn, 46 N.J. at 251.

Defendant relies on the jurors' emotional responses to verbal attacks on discordant views and alleged bullying among jurors to support his argument that the verdict was irreparably tainted.  However, when the problems with a juror "'are due to interactions with other jurors, the court should instruct the

jury to resume deliberations'" as occurred here.  Jenkins, 182 N.J. at 125 (quoting Hightower, 146 N.J. at 254).  Other than giving the jury the Czachor charge, "a trial judge has no role to play in facilitating the jury's discussions." Gleaton, 446 N.J. Super. at 524.

To be sure, we are troubled by certain comments attributed to jurors as relayed to the judge by the complaining jurors.  However, the circumstances we condemned in Dorsainvil stand in sharp contrast to what occurred in this case.  There is simply no comparison between jurors exchanging caustic comments and the "[p]hysical violence" that erupted among jurors during deliberations that "contaminated" the deliberations in Dorsainvil and resulted in the reversal of the defendant's convictions.  435 N.J. Super. at 453. "Physical violence among jurors is the antithesis of the rational discourse embodied" in the Czachor charge.  Dorsainvil, 435 N.J. Super. at 482.

> These instructions envision a deliberative process guided by reason and integrity.  The admonition to guard against reaching an agreement that may do "violence to individual judgment" is a metaphor for what we now refer to as "bullying."  The instruction warns against majoritarian bullying and permitting expediency of results to justify intellectual and moral dishonesty.  The corrosive effect "violence to individual judgment" may have on the deliberative process pales in comparison to the chilling effect actual physical violence can have on the ability to

30

freely and honestly express controversial or unpopular views.

[Ibid.]

What occurred here was "a passionate exchange of conflicting views" rather than "belligerent acts" among jurors as occurred in Dorsainvil. Id. at 483. Critically, the jury reached a partial verdict not long after the judge instructed the jurors "to treat each other with . . . respect and dignity" and "to deliberate with the view toward reaching an agreement if you can do so without violence to your individual judgement." The judge received no additional notes after giving these supplemental instructions. State v. Burns, 192 N.J. 312, 335 (2007) ("[T]he jury is presumed to follow the trial court's instructions."). Because we conclude the verdict was not tainted by an unduly coercive and chaotic environment during deliberations, we discern no abuse of discretion in the judge's denial of defendant's serial mistrial applications, and we are satisfied defendant's right to a fair and impartial trial was not compromised.

III.

In Point II, defendant argues the judge erred in admitting his statement because defendant was not "informed by Sergeant Wang about his true status" before he was questioned. According to defendant, "he was only told that they

31

were looking into a claim of forced prostitution" which "is not the same thing as the criminal charges of human trafficking, promotion of prostitution, and sexual assault of a minor, that ultimately defendant would be charged with and then indicted." As a result, defendant asserts "any alleged waiver of his right to remain silent could not have been made knowingly and voluntarily."

"A defendant's statement to the police, made in custody, is admissible if it is given freely and voluntarily, after the defendant received Miranda warnings, and after he knowingly, voluntarily, and intelligently waived his rights." State v. O.D.A.-C., 250 N.J. 408, 413 (2022). "The State must prove beyond a reasonable doubt that a defendant's waiver was valid." Ibid. (citing State v. Sims, 250 N.J. 189, 211 (2022)). "Courts look to the totality of the circumstances to assess whether the State has met its burden." Ibid. "Under the totality-of-the-circumstances test, courts commonly consider a number of factors to determine if a Miranda waiver is valid." Id. at 421. "They include the suspect's 'education and intelligence, age, familiarity with the criminal justice system, physical and mental condition, . . . drug and alcohol problems,' how explicit the waiver was, and the amount of time between the reading of the rights and any admissions." Ibid. (quoting 49 Geo. L.J. Ann. Rev. Crim. Proc. 233-36 (2020)). Additionally, while "a valid waiver does not require that

32

an individual be informed of all information 'useful' in making his decision," "the failure to be told of one's suspect status still would be only one of many factors to be considered in the totality of the circumstances." State v. Nyhammer, 197 N.J. 383, 407 (2009) (quoting Colorado v. Spring, 479 U.S. 564, 576 (1987)).

In State v. A.G.D., our Supreme Court held that a Miranda waiver is invalid "when the police fail to inform [a defendant] that a criminal complaint or arrest warrant has been filed or issued against him and he otherwise does not know that fact." 178 N.J. 56, 58 (2003). "The government's failure to inform a suspect that a criminal complaint or arrest warrant has been filed or issued deprives that person of information indispensable to a knowing and intelligent waiver of rights[,] . . . regardless of other factors that might support [the] confession's admission." Id. at 68. In State v. Vincenty, 237 N.J. 122, 134 (2019), the Court held that if charges have been filed against a suspect prior to his interrogation, law enforcement officers should provide the suspect with "a simple declaratory statement" identifying those charges before questioning him. "The State may choose to notify defendants immediately before or after administering Miranda warnings, so long as defendants are

aware of the charges pending against them before they are asked to waive the right to self-incrimination." Ibid.

In State v. Sims, 466 N.J. Super. 346, 369 (App. Div. 2021), rev'd and remanded, 250 N.J. 189 (2022), reconsideration denied, 250 N.J. 493 (2022), this court expanded the rule announced in A.G.D. and adopted a new rule requiring officers to tell an arrestee, not subject to a complaint-warrant or arrest warrant, what charges he faced before interrogating him. In that case, the defendant asserted that his Miranda rights were violated because the police did not tell him why he was arrested. Ibid. In reversing the decision, our Supreme Court "decline[d] to adopt the rule prescribed by the Appellate Division," reasoning that such an expansion was "unwarranted and impractical." Sims, 250 N.J. at 197, 214.

The Court explained:

> The principle stated in A.G.D. stands in stark contrast to the Appellate Division's expanded definition of an arrestee's Miranda rights. The Appellate Division's rule relies not on an objective statement of the charges pending against the arrestee, but on an officer's prediction, based on information learned to date in a developing investigation, of what charges may be filed. . . . [E]ven when there is probable cause for an arrest, there may be insufficient information about the victim's injuries, the arrestee's mental state, and other key issues to enable an officer to accurately identify the charges. An officer acting in

34

good faith might inadvertently misinform an arrestee as to the charges that he will eventually face. We do not share the Appellate Division's conclusion that law enforcement officers can resolve any ambiguities or disputes about charging decisions before a judicial officer has reviewed the showing of probable cause and issued a complaint-warrant or arrest warrant.

[Id. at 215-16 (citation omitted) (citing Sims, 466 N.J. Super. at 361-69, 381-83) (Susswein, J., concurring and dissenting).]

"Ultimately, under New Jersey law, it is the formidable proof-beyond-a-reasonable-doubt standard, rather than a bright-line suspect notification requirement, that safeguards the constitutional rights of interrogees who have not been formally charged with the crime that is the subject-matter of the custodial interrogation." State v. Cotto, 471 N.J. Super. 489, 519 (App. Div. 2022). In our review of a trial court's Miranda ruling, we give "deference to a trial court's factfindings, even factfindings based solely on video or documentary evidence," State v. S.S., 229 N.J. 360, 379 (2017), "so long as they are supported by sufficient credible evidence in the record," O.D.A.-C., 250 N.J. at 425. "But we are not bound by the trial court's determination of the validity of the waiver, which is a legal, not a factual, question." Ibid.

35

Here, on January 9, 2019, the motion judge[8] conducted an evidentiary hearing pursuant to N.J.R.E. 104 to determine the admissibility of defendant's statement. Wang testified at the hearing, consistent with his trial testimony. The judge credited Wang's testimony, finding that it was "forthright, candid and direct." Wang stated that he met defendant for the first time "[i]n the interview room of the Rockaway Township Police Department" and was informed that defendant had been "brought" there by "law enforcement." Wang confirmed that he read defendant his <u>Miranda</u> rights utilizing the Morris County Prosecutor's Office notification of rights form. Defendant read, signed, and initialed the form, confirming that he agreed to waive his rights and make a statement. The form was admitted into evidence.

According to Wang, the interview began at 10:00 p.m. on June 26, 2019, and lasted approximately two-and-one-half hours. Defendant was not handcuffed during the interview. The interview was recorded, and the recording was admitted into evidence and reviewed by the judge. Wang testified that after the interview ended, he "advised [defendant] he was under arrest." Wang acknowledged that he was surprised to learn later that defendant

---

[8] The motion judge was not the trial judge.

had been arrested when he was initially stopped by police, prior to the interview.

Based on the totality of the circumstances, the judge determined that the State had proven beyond a reasonable doubt that defendant's waiver of his Miranda rights was knowing and voluntary and held that his statement was admissible at trial. In a comprehensive written opinion, the judge concluded "defendant knew he was under arrest and the subject of an investigation regarding forced prostitution before his interview" and "[w]ith the knowledge defendant had about his custodial status and the nature of the investigation by police, he then voluntarily, knowingly and intelligently waived his right to remain silent and spoke to police."

The judge distinguished A.G.D., finding "even though the interrogating officers initially were unaware defendant had been told during his motor vehicle stop that he was under arrest, they immediately Mirandized defendant, spoke to him without being handcuffed, and promptly let him know they were investigating his involvement in forced prostitution." Also, unlike the defendant in A.G.D., the judge found defendant "was not deprived of information indispensable to his being able to provide a knowing and intelligent waiver of his rights." Instead, defendant "believed he already was

37

under arrest at the time of his interview" based on his motor vehicle stop and was informed by Wang "at the outset . . . that he was the target of an investigation involving prostitution." In fact, the judge pointed out that because "<u>Miranda</u> rights were administered to . . . defendant during his motor vehicle stop and again at the outset of his interview," defendant was provided "with an enhanced level of warning."

Further, based on her review of the taped statement, the judge found "defendant easily fielded questions from officers and was deliberate in his responses to law enforcement during his interview." The judge also confirmed that defendant "was offered water and a restroom break" during a two-and-one-half-hour interview. According to the judge, "defendant's demeanor . . . bolster[ed] the conclusion defendant was mentally competent and acting voluntarily when he waived his <u>Miranda</u> rights" and "[n]othing in the video . . . suggest[ed] his will was overborne or he was overwhelmed."

> Moreover, he was not coerced, pressured, under duress or lacking understanding when he made various incriminating statements to police. Further, his questioning was not excessively prolonged. It also is not disputed that defendant has a criminal history and has served time in federal prison. Therefore, this court finds defendant chose to give incriminating statements to the police voluntarily, intelligently and knowingly.

38

According the judge's findings of fact the deference our law requires, we affirm the judge's application of the totality-of-the-circumstances standard to deny defendant's motion to suppress his statement. Defendant argues the judge misapplied both A.G.D. and Vincenty and relies on this court's decision in Sims to support his claim. However, because our Supreme Court "expressly declined to expand the reach of the A.G.D./Vincenty bright-line rules by requiring police to inform an interrogee of charges that have not yet been filed, regardless of whether the interrogee was a suspect or whether police had probable cause to apply for a complaint-warrant or arrest warrant," Cotto, 471 N.J. Super. at 517, defendant's argument fails. See Sims, 250 N.J. at 217. We find the judge's factual findings to be supported by sufficient credible evidence in the record and concur with the judge's legal conclusion that the totality of the circumstances warranted the denial of defendant's motion to suppress his statement to police.

IV.

In Point III, defendant argues the trial judge's refusal to give a Clawans charge upon defendant's request when the State rested without calling Kooken as a witness "constituted reversible error."

We review the trial court's failure to give an adverse inference charge, commonly known as a <u>Clawans</u> charge, under an abuse of discretion standard. <u>State v. Dabas</u>, 215 N.J. 114, 132 (2013). "Generally, failure of a party to produce before a trial tribunal proof which, it appears, would serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him." <u>Clawans</u>, 38 N.J. at 170. However, "[t]he inference is not available whenever a party declines to call a witness who has knowledge of the relevant facts." <u>State v. Velasquez</u>, 391 N.J. Super. 291, 306 (App. Div. 2007). In fact, "such an inference cannot arise except upon certain conditions and the inference is always open to destruction by explanation of circumstances which make some other hypothesis a more natural one than the party's fear of exposure." <u>Clawans</u>, 38 N.J. at 170-71.

To determine whether to give a <u>Clawans</u> charge, a trial court must consider all relevant circumstances and place on the record findings on each of the following:

> (1) that the uncalled witness is peculiarly within the control or power of only the one party, or that there is a special relationship between the party and the witness or the party has superior knowledge of the identity of the witness or of the testimony the witness might be expected to give; (2) that the witness is

available to that party both practically and physically; (3) that the testimony of the uncalled witness will elucidate relevant and critical facts in issue[;] and (4) that such testimony appears to be superior to that already utilized in respect to the fact to be proven.

[State v. Hill, 199 N.J. 545, 561 (2009) (alteration in original) (quoting State v. Hickman, 204 N.J. Super. 409, 414 (App. Div. 1985))].

Because there are a multitude of reasons why a party may not call a particular witness, our courts have exercised caution before granting a request for a Clawans charge. See Velasquez, 391 N.J. Super. at 308-09 ("[W]hen the testimony to be expected . . . is unimportant to the litigant's case, cumulative or inferior to testimony already presented on the issue, it is more reasonable to infer that non-production is explained by the fact that the testimony is unnecessary."). Moreover, "when it is more reasonable to infer that the litigant's decision to do without the testimony is explained by factors other than the litigant's fear of its content, the inference is not properly drawn." Id. at 306 (citing Clawans, 38 N.J. at 171).

Here, when the State rested its case without calling Kooken as a witness, defense counsel made a timely request for a Clawans charge. In an oral decision, the trial judge denied the request, finding that Kooken's testimony would be "somewhat cumulative" given the testimony of S.B. and K.M., and

41

"there [was] no showing . . . that [Kooken] had any superior knowledge of the incidents" beyond S.B.'s and K.M.'s testimony. The judge also found "there [was] absolutely nothing to . . . indicate" that Kooken's testimony "would be adverse to the State," and Kooken "was certainly available for subpoena by either side."

Defendant argues Kooken's testimony was critical because she was the co-conspirator most actively involved in prostituting the girls, posting their photos, and arranging customers and prices. He argues no one else had personal knowledge of the customer arrangements other than Kooken. However, S.B.'s and K.M.'s testimony at trial belie defendant's claim that Kooken's testimony would have been superior to that given by the girls. Further, the photos the girls sent to Kooken and the text messages between S.B. and Kooken, which were admitted into evidence, corroborated the girls' accounts of their interactions with Kooken. Moreover, Kooken inculpated defendant during the investigation and entered into a favorable plea agreement with the State contingent upon her cooperation. Because Kooken's testimony would have likely bolstered the State's case, rather than being adverse to it, it is more reasonable to infer the State did not call Kooken for a myriad of reasons other than "fear of [her testimony's] content." Velasquez, 391 N.J.

Super. at 306; Clawans, 38 N.J. at 171. In any event, as the judge pointed out, Kooken was available to both parties. Thus, we discern no abuse of discretion in the judge's denial of defendant's request for a Clawans charge.

V.

In Point IV, defendant argues the motion judge "hindered his ability to present a theory of third-party guilt and deprived him of the opportunity to present a complete defense" by denying further discovery and then barring any testimony regarding the Guzman case notwithstanding the fact that Guzman had been convicted for "conduct that specifically involved S.B. and K.M." Defendant contends he "had the right to see the discovery in the case against . . . Guzman" because "it involved the same two victims, it involved similar charges, and concerned conduct that took place during a time period that was very close to that of the charges against [defendant]."

We review a trial court's discovery rulings under an abuse of discretion standard. State v. Brown, 236 N.J. 497, 521 (2019). We "generally defer to a trial court's resolution of a discovery matter, provided its determination is not so wide of the mark or is not 'based on a mistaken understanding of the applicable law.'" State in Interest of A.B., 219 N.J. 542, 554 (2014) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 334, 371 (2011)).

43

However, "[i]n construing the meaning of a statute, . . . 'our review is de novo, and therefore we owe no deference to the trial court's . . . legal conclusions.'" Id. at 554-55 (quoting Farmers Mut. Fire Ins. Co. v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 215 N.J. 522, 535 (2013)).

The Rape Shield Law, N.J.S.A. 2C:14-7, governs the introduction of evidence of a victim's prior sexual conduct and provides, in pertinent part:

> [I]n prosecutions for aggravated sexual assault, sexual assault, aggravated criminal sexual contact, criminal sexual contact, human trafficking involving sexual activity, endangering the welfare of a child in violation of [N.J.S.A.] 2C:24-4 . . . , evidence of the victim's previous sexual conduct shall not be admitted nor reference made to it in the presence of the jury except as provided in this section.
>
> [N.J.S.A. 2C:14-7(a).]

"[T]he Rape Shield Law 'is designed "to deter the unwarranted and unscrupulous foraging for character-assassination information about the victim" and "does not permit introduction of evidence of the victim's past sexual conduct to cast the victim as promiscuous or of low moral character."'" State v. Perry, 225 N.J. 222, 234 (2016) (quoting State v. Schnabel, 196 N.J. 116, 128 (2008)). "While the protection of the 'privacy interests of the victim' is certainly paramount to its purpose, the Rape Shield Law also aims to 'ensur[e] a fair determination of the issues bearing on the guilt or innocence of

44

the defendant'" and, to that end, "we have consistently refused to construe the Rape Shield Law in a way that would impinge on a defendant's constitutional right to a fair trial," which "includes 'a meaningful opportunity to present a complete defense' . . . and to have compulsory process for obtaining witnesses in his favor." Id. at 235 (first alteration in original) (first quoting State v. P.S., 202 N.J. 232, 261 (2010); and then quoting State v. J.A.C., 210 N.J. 281, 298 (2012)).

Our case law interpreting the Rape Shield Law requires a two-step analysis to reconcile these competing interests. Id. at 236; see also State v. Garron, 177 N.J. 147, 172-73 (2003); State v. Budis, 125 N.J. 519, 532-34 (1991). "The first step requires the trial court to ascertain whether evidence . . . is relevant and necessary to resolve a material issue in light of the other evidence that is available to address that issue." Perry, 225 N.J. at 236-37. "If found to be relevant," the second step requires the trial court to "decide whether, under N.J.R.E. 403, the probative value of the contested evidence outweighs the prejudicial effect to the victim." Id. at 237.

"[T]he probative value of a victim's prior sexual conduct 'depends on clear proof that [the conduct] occurred, that [it is] relevant to a material issue in the case, and that [it is] necessary to a defense.'" Ibid. (second, third, and

45

fourth alterations in original) (quoting J.A.C., 210 N.J. at 300). The prejudice "includes the trauma to the victim, the . . . [invasion of] the victim's privacy, the 'impact of a given ruling on a victim reporting sexual abuse,' as well as the need to guard victims from excessive cross-examination and prevent undue jury confusion." Ibid. (quoting J.A.C., 210 N.J. at 300). "The determination of whether evidence of a victim's prior sexual conduct is admissible 'is exquisitely fact-sensitive' and 'depends on the facts of each case.'" Id. at 238 (quoting State v. J.D., 211 N.J. 344, 358 (2012)).

Defendant posits evidence of prior sexual conduct between the girls and Guzman supported a defense of third-party guilt. Our courts have long recognized that "by implication, a complete defense includes a criminal defendant's right to introduce evidence of third-party guilt 'if the proof offered has a rational tendency to engender a reasonable doubt with respect to an essential feature of the State's case.'" State v. Cotto, 182 N.J. 316, 332 (2005) (quoting State v. Fortin, 178 N.J. 540, 591 (2004)). "That standard does not require a defendant to provide evidence that substantially proves the guilt of another, but to provide evidence that creates the possibility of reasonable doubt." Ibid. However, "a defendant cannot simply seek to introduce evidence of some hostile or indecent event and 'leave its connection with the

case to mere conjecture.'" Perry, 225 N.J. at 239 (quoting State v. Sturdivant, 31 N.J. 165, 179 (1959)). "Rather, the evidence . . . must be capable of demonstrating 'some link between the [third-party] evidence and the victim or the crime.'" Ibid. (second alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 301 (1988)). "The decision to admit or exclude evidence of third-party guilt is 'particularly fact-sensitive' and rests within the trial court's discretion." Ibid. (quoting State v. Loftin, 146 N.J. 295, 345 (1996)).

Defendant sought discovery regarding the Guzman case, including texts and instant messages between the parties. Guzman was a former Rockaway Borough police officer who was indicted in November 2017 on multiple counts of sexual assault, endangering the welfare of a child and official misconduct involving S.B. and K.M. Guzman was convicted and sentenced to a term of imprisonment for official misconduct stemming from having sexual relations with S.B. and K.M. Before trial, defendant sought to introduce evidence of past sexual conduct between the girls and Guzman, which acts led to Guzman's conviction.

In a comprehensive written opinion, the motion judge determined that evidence of prior sexual acts between Guzman, S.B. and K.M. was barred by the Rape Shield Law. The judge explained that allowing such evidence

47

"would prevent the protection of the victims and subject them to improper questioning about their prior sexual experiences as minors." Further, the judge pointed out that defendant had failed to show how such evidence was relevant under the first prong of <u>Perry</u>, and, even if the evidence were relevant and necessary, "the probative value . . . [was] outweighed by the prejudicial effect" on S.B. and K.M., "which would include invasion of their privacy, not to mention leav[ing] them open to excessive cross-examination and create[ing] undue jury confusion." Accordingly, the judge precluded any references to these acts at trial and prohibited any further discovery.

Defendant contends the evidence, as well as the related text messages on S.B.'s cell phone, would have allowed him to present a theory of third-party guilt by arguing that Guzman was "facilitating the prostitution of S.B.," instead of defendant. Despite the similarities between the cases, however, there is no real link between the third-party evidence and the crimes with which defendant was charged. <u>See</u> <u>Perry</u>, 225 N.J. at 239. There is no evidence, for instance, suggesting that Guzman was in any way involved with Kooken, who was an active participant in setting up the current scheme. Nor is there any indication that Guzman was involved with prostitution or human trafficking. We therefore reject defendant's attempt to introduce a "hostile or

A-1330-19

indecent event and 'leave its connection with the case to mere conjecture.'" Ibid. (quoting Sturdivant, 31 N.J. at 179). We affirm the motion judge's decision for the reasons stated in her well-reasoned written opinion.

VI.

In Point V, defendant argues his sentence is "excessive." He asserts the trial judge "engaged in an unfair balancing of the Yarbough[9] factors to find that both [c]ounts one and [t]wo should run consecutively."

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

_____

9 State v. Yarbough, 100 N.J. 627 (1985).

In Yarbough, our Supreme Court set forth the following criteria as "general sentencing guidelines" for evaluating the threshold question of whether to impose concurrent or consecutive sentences for multiple offenses pursuant to N.J.S.A. 2C:44-5(a):

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
>
>> (a) the crimes and their objectives were predominantly independent of each other;
>>
>> (b) the crimes involved separate acts of violence or threats of violence;
>>
>> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>>
>> (d) any of the crimes involved multiple victims;
>>
>> (e) the convictions for which the sentences are to be imposed are numerous.

(4) there should be no double counting of aggravating factors; [and]

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense . . . .

[Id. at 643-44.]

"The Yarbough factors serve much the same purpose that aggravating and mitigating factors do in guiding the court toward a sentence within the statutory range." State v. Abdullah, 184 N.J. 497, 514 (2005). "[T]he five 'facts relating to the crimes' contained in Yarbough's third guideline should be applied qualitatively, not quantitatively," and consecutive sentences may be imposed "even though a majority of the Yarbough factors support concurrent sentences." State v. Carey, 168 N.J. 413, 427-28 (2001); see also State v. Molina, 168 N.J. 436, 442-43 (2001) (affirming consecutive sentences although "the only factor that support[ed] consecutive sentences [was] the presence of multiple victims").

"A sentencing court must explain its decision to impose concurrent or consecutive sentences in a given case; '[a] statement of reasons is a necessary prerequisite for adequate appellate review of sentencing decisions.'" Cuff, 239 N.J. at 348 (alteration in original) (quoting State v. Miller, 108 N.J. 112, 122 (1987)). "When a court 'fails to give proper reasons for imposing consecutive

51

sentences at a single sentencing proceeding, ordinarily a remand should be required for resentencing.'" Id. at 348 (quoting Carey, 168 N.J. at 424).

In Abdullah, the Court reminded trial judges "that when imposing either consecutive or concurrent sentences, '[t]he focus should be on the fairness of the overall sentence,' and that they should articulate the reasons for their decisions with specific reference to the Yarbough factors." 184 N.J. at 515 (alteration in original) (quoting Miller, 108 N.J. at 122). In State v. Torres, 246 N.J. 246 (2021), the Court held that when imposing lengthy consecutive sentences, "an explanation for the overall fairness of a sentence by the sentencing court is required" in order "to 'foster[] consistency in . . . sentencing in that arbitrary or irrational sentencing can be curtailed and, if necessary, corrected through appellate review.'" Id. at 272 (alterations in original) (quoting State v. Pierce, 188 N.J. 155, 166-67 (2006)).

The Court stated "[t]he sentencing court's explanation of overall fairness provides a proper record for appellate review of the sentencing court's exercise of discretion." Ibid. The Court reasoned that "[f]ailure to police the fairness of consecutive sentences not only undermines Yarbough's goal of promoting predictability and uniformity in sentencing, but also risks deviating from the Legislature's command that the Code be construed so as to 'safeguard

52

offenders against excessive, disproportionate or arbitrary punishment.'" Torres, 246 N.J. at 272-73 (quoting N.J.S.A. 2C:1-2(b)(4)). Thus, consideration of the fairness of the overall sentence is "a necessary feature in any Yarbough analysis." Cuff, 239 N.J. at 352.

Here, based on the "gravity of harm" inflicted on the victims, the "substantial risk of reoffense," defendant's "prior criminal record," and "the need to deter," the judge found aggravating factors two, three, six, and nine, and no mitigating factors. See N.J.S.A. 2C:44-1(a)(2), (3), (6), and (9). Defendant does not challenge these findings but argues the judge abused his discretion in imposing consecutive sentences on counts one and two by only considering the multiple-victims factor and never addressing the other Yarbough factors. However, the multiple-victims factor should be given "great weight and should ordinarily result in the imposition of at least two consecutive terms." Molina, 168 N.J. at 442 (quoting Carey, 168 N.J. at 429-30). Here, the judge properly determined consecutive sentences were appropriate because "there [were] two separate victims" and the girls were "individuals, who suffer[ed] . . . individually" and "cannot simply be lumped together as victims."

The judge also stressed that defendant's conduct "[still] lives with" the girls, that defendant made "no apologies for his actions," and that defendant "preyed upon two drug-addicted children and exploited them for his own purposes." We are satisfied that the judge's statements comport with Yarbough, and comply with Torres's requirement for "an explanation for the overall fairness of a sentence." 246 N.J. at 272.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION